**BRUNER CORPORATION, Plaintiff–Appellee, Cross–Appellant,**

**v.**

**R.A. BRUNER COMPANY and Robert A. Bruner, Sr., Defendants–Appellants, Cross Appellees.**

Nos. 96–3537, 96–3640.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1997.

Decided Jan. 7, 1998.

Maureen A. McGinnity (argued), Brett H. Ludwig, Kevin Banasik, Foley & Lardner, Milwaukee, WI, for Plaintiff–Appellee/Cross–Appellant.

Gerardo H. Gonzalez (argued), Gonzalez, Saggio, Birdsall & Harlan, Milwaukee, WI, for Defendants–Appellants/Cross–Appellees in No. 96–3537.

Margaret A. Watt, Gerardo H. Gonzalez, Jennifer Anne Pflug, Gonzalez, Saggio, Birdsall & Harlan, Milwaukee, WI, for Defendants–Appellants/Cross–Appellees in No. 96–3640.

Before CUMMINGS, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Bruner Corporation designs and manufactures water treatment systems. In the mid–1980s, a trusted Bruner Corporation employee named John Balogh began selling the Corporation's products to various retailers on his own and pocketing the profits. One of the purchasers of this stolen property was R.A. Bruner, a sole proprietorship run by the son of Bruner Corporation's founder. Bruner Corporation eventually discovered the scheme and sued R.A. Bruner, among others,[1] for violations of the Racketeer–Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), the Wisconsin Organized Crime Control Act (WOCCA), Wis. Stat. § 946.83(3), and Wisconsin's civil conspiracy law, Wis. Stat. § 134.01. The complaint also contained a claim for conversion.

Both parties moved for summary judgment. The district court rejected Bruner Corporation's RICO, WOCCA, and civil conspiracy claims. However, the court entered judgment in favor of Bruner Corporation on the conversion charge and, finding that no genuine issue of material fact existed regarding the damages for conversion, the court calculated damages in the amount of $220,498.70. Both parties appeal the district court's decision.

In R.A. Bruner's appeal of the amount of conversion damages, we vacate the district court's award and remand for further proceedings to recalculate conversion damages. In Bruner Corporation's appeal of the dismissal of its RICO, WOCCA, and civil conspiracy claims, we reverse and remand for further proceedings, because genuine issues of material fact exist regarding R.A. Bruner's knowledge that the goods it purchased from John Balogh were stolen.

## I. Background

*A. Relationship Between Bruner Corporation and R.A. Bruner.*

Until the late 1960s, Appellant Robert A. Bruner, Sr. worked for Bruner Corporation, which was founded in the 1940s by Ted Bruner, the appellant's father. In 1974, Robert Bruner formed a sole proprietorship, operating under the name "R.A. Bruner," to sell and service the products of Bruner Corporation and other manufacturers. Bruner Corporation is no longer owned by the Bruner family. The Corporation has changed hands several times over the years; the current management took control of the company in April 1990.

Starting in the mid–1980s, R.A. Bruner purchased Bruner Corporation products both directly from the Corporation's customer service department and indirectly through John Balogh, a long-time Corporation employee who served as a liaison to the retailers of Corporation products. At that time, Bruner Corporation sold its products to consumers through official manufacturer's representatives as well as through independent retailers. Although R.A. Bruner was an independent retailer, it bought Bruner Corporation products at the same discounted rate—40% below the list price—as the official manufacturer's representatives.

This arrangement changed when new management took over Bruner Corporation in 1990. The new management decided to make direct sales only to official manufacturer's representatives, who would continue to receive a 40% discount. Accordingly, management told R.A. Bruner and other independent retailers that they would no longer be able to buy directly from Bruner Corporation.

Despite this change in official policy, John Balogh continued to sell the Corporation's products to R.A. Bruner after 1990. At some point during this period, R.A. Bruner began to receive an even greater discount (46% off list price) from Balogh, purportedly to allow it to remain competitive with the local official manufacturer's representative, Stickler & Associates. Many, if not all, of the Balogh sales were unauthorized; John Balogh was stealing Corporation products, selling them on the side to his retailer customers, and keeping the profits for himself.[2]

---

1. The appeal of a second defendant, Lukens Enterprises, Inc., was dismissed by stipulation.

2. John Balogh pleaded guilty to one count of interstate transportation of stolen goods, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2, and

## B. Disposition Below

Bruner Corporation filed this damages suit against R.A. Bruner alleging common-law conversion and violations of RICO, WOCCA, and Wisconsin's civil conspiracy law. The district court granted summary judgment in favor of R.A. Bruner and its codefendant (another retailer) on all counts except the conversion claim. The court held that "the record clearly shows these defendants were unaware that the Bruner [Corporation] products they purchased from John Balogh had been stolen" and therefore "the mens rea required for a finding that they violated RICO, WOCCA or Wisconsin's civil conspiracy law is absent." [3]

The court granted summary judgment in favor of Bruner Corporation, however, on the conversion cause of action,[4] holding that R.A. Bruner is liable for conversion as a purchaser of stolen goods even though it did not know that the goods were stolen. The court relied on the list prices of the stolen goods in calculating damages and ordered R.A. Bruner to pay $220,498.70.

■ R.A. Bruner filed a motion to amend the judgment and a motion for relief from the judgment. As part of these motions, R.A. Bruner argued that a clause in the settlement agreement between John Balogh and Bruner Corporation negated the conversion damages owed by R.A. Bruner. This clause consisted of a so-called "Pierringer release," which under Wisconsin law is an instrument by which a tort plaintiff settles with a tortfeasor, reserves its right to pursue claims against other joint tortfeasors, and agrees to indemnify the settling tortfeasor for any claims for contribution that non-

settling tortfeasors might bring against the settling tortfeasor. See Pierringer v. Hoger, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

In its post-judgment motions, R.A. Bruner seized on the Pierringer release as a way to nullify its liability for conversion. R.A. Bruner argues that it owes damages based on its joint and several liability with John Balogh, the seller of the stolen property. In apportioning liability between the joint tortfeasors, R.A. Bruner asserts that the court should attribute 100% of the liability to Balogh, for only Balogh acted intentionally. Thus, if R.A. Bruner owes $220,498.70 to Bruner Corporation, as the district court found, then Balogh owes R.A. Bruner 100% of this amount in contribution.

The Pierringer release, however, provides that Bruner Corporation will indemnify Balogh against claims for contribution brought by his joint tortfeasors. Thus, if Balogh owes R.A. Bruner $220,498.70 in contribution, the argument runs, then Bruner Corporation must owe Balogh that same amount. The upshot of this argument is that the $220,498.70 in conversion damages owed by R.A. Bruner to Bruner Corporation is actually owed by Bruner Corporation to itself. The district court dismissed this argument as untimely because it was not raised as part of the parties' motions for summary judgment.

Both Bruner Corporation and R.A. Bruner appeal from the district court's decision on their motions for summary judgment. Bruner Corporation asks this court to reinstate its RICO, WOCCA, and civil conspiracy claims, which the district court had rejected based on the defendant's ignorance that the goods were stolen.[5] R.A. Bruner repeats its Pier-

Bruner Corporation eventually settled its civil claims against Balogh.

**3.** Bruner Corporation's civil RICO and WOCCA claims are predicated on the underlying offenses of mail fraud, wire fraud, and interstate transportation of stolen goods, all of which require some showing of intentional wrongdoing. See 18 U.S.C. § 1341 (mail fraud); id. § 1343 (wire fraud); id. § 2314 (interstate transportation of stolen goods); see also Emery v. American Gen. Fin., Inc., 71 F.3d 1343, 1346, 1348 (7th Cir. 1995) (describing intent requirement for mail and wire fraud as predicate RICO offenses).

The Wisconsin civil conspiracy law also has a mens rea requirement. It imposes liability when

defendants act "for the purpose of wilfully or maliciously injuring another in his or her reputation, trade, business or profession by any means whatever". Wis. Stat. § 134.01.

**4.** The court also granted summary judgment in favor of Bruner Corporation on R.A. Bruner's counterclaims alleging tortious interference with contractual relationships and violation of the Wisconsin Fair Dealership Law. R.A. Bruner does not appeal this portion of the judgment.

**5.** There is an additional wrinkle regarding the RICO and WOCCA claims. Prior to the summary judgment proceedings, the district court dismissed the RICO and WOCCA claims against

ringer release argument on appeal, and it also challenges the district court's reliance on the list prices of the stolen Bruner Corporation products in calculating conversion damages. We address each of the parties' contentions below.

## II. Bruner Corporation's Appeals

We review *de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in its favor. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 578 (7th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

Bruner Corporation appeals from the district court's summary judgment decision denying relief on the company's RICO, WOC-CA, and civil conspiracy claims. As the district court explained, in order to satisfy the *mens rea* requirements of RICO, WOC-CA, and Wisconsin's civil conspiracy statute, Bruner Corporation must prove that R.A. Bruner knew that the goods it purchased from John Balogh were stolen. *See supra* note 3. Bruner Corporation argues that a genuine issue of material fact exists as to R.A. Bruner's knowledge that the goods were stolen, for three reasons: (1) R.A. Bruner was aware that its purchases from Balogh deviated from official company procedures; (2) it knew that the prices charged by Balogh were below the factory direct prices paid by official manufacturer's representatives; and (3) it had been told by Bruner Corporation that it could not purchase directly from Balogh.

■ Bruner Corporation's first argument is based on the different payment and invoicing procedures used when R.A. Bruner purchased from John Balogh as opposed to when it purchased from Bruner Corporation's customer service department. When it purchased from the company, R.A. Bruner made its checks payable to Bruner Corporation and received computer-printed invoices from Bruner Corporation that prominently displayed the company name and logo. By contrast, when it purchased through Balogh, R.A. Bruner made its checks payable directly to Balogh, who gave in return hand-written invoices displaying no company name or logo. Bruner Corporation contends that a reasonable fact-finder could rely on this discrepancy in the payment and invoicing procedures as support for a finding that R.A. Bruner either knew that the goods purchased through Balogh were stolen, or at least knew enough that it should have inquired as to whether the sales were authorized.

The problem with this argument is that, for several years prior to the start of Balogh's trafficking in stolen goods, Bruner Corporation allowed R.A. Bruner to purchase the Corporation's products both directly and through John Balogh. There is no evidence in the record that the payment and invoicing procedures used prior to the conversion period were any different than those used during the conversion period. We do not agree that the different invoicing procedures, standing alone, can support an inference that R.A. Bruner knew that Balogh was selling stolen property.

R.A. Bruner's codefendants, Lukens Enterprises and Bert A. Lukens. The court found that the Second Amended Complaint failed to allege the predicate acts of mail and wire fraud with sufficient particularity. Order of April 26, 1995 at 3–6. Bruner Corporation argues on appeal that this decision was erroneous, but since the Lukens defendants are no longer parties to this appeal, the issue is moot.

R.A. Bruner also moved to dismiss the RICO and WOCCA claims against it for failure to plead with sufficient particularity, as part of its motion for summary judgment. The court did not address this argument, however, but instead granted summary judgment on the grounds of R.A. Bruner's lack of knowledge. Accordingly, because there has been no decision on this issue below, we do not address the sufficiency of the Complaint's allegations of mail and wire fraud as they pertain to R.A. Bruner.

Bruner Corporation's other evidence, however, does support its contention that a genuine issue of fact exists in this regard. The record shows that R.A. Bruner knew that the prices it was getting from John Balogh on Bruner Corporation products were lower than the factory direct prices that it would have to pay if it made its purchases through Bruner Corporation's normal channels. Initially, John Balogh charged R.A. Bruner 40% less than the list price, which was the same discount offered to the official manufacturer's representatives. At some point along the way, however, Balogh began offering an even greater discount of 46% below list price. R.A. Bruner admits that this discount surpassed any that it (or, to its knowledge, any official manufacturer's representative) had received before, though it claims that it accepted Balogh's explanation of the deeper discount as a means for R.A. Bruner to stay competitive with the official manufacturer's representatives. Since Bruner Corporation never offered R.A. Bruner a discount greater than 40% when R.A. Bruner purchased through the Corporation directly, a reasonable fact-finder could conclude that R.A. Bruner knew or should have known that the additional discount it received from Balogh was not authorized by his supervisors. At the least, a reasonable fact-finder could conclude that this triggered R.A. Bruner's obligation to investigate further the propriety of Balogh's sales. *See, e.g., United States v. Crabtree,* 979 F.2d 1261, 1269–70 (7th Cir.1992) (approving the use of an ostrich instruction, in a criminal prosecution for interstate transportation of stolen goods, to "inform[ ] the jury that guilty knowledge can be inferred from a combination of suspicion and deliberate ignorance"), *cert. denied,* 510 U.S. 878, 114 S.Ct. 216, 217, 126 L.Ed.2d 173 (1993); *United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.) (approving the use of an ostrich instruction in a case involving prosecution for mail and wire fraud), *cert. denied sub nom. McCreary v. United States,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986).

In addition, the management of Bruner Corporation told R.A. Bruner on at least two occasions after 1990 that it could no longer purchase directly from the company. In a letter dated July 8, 1991, Bruner Corporation management told R.A. Bruner that it could not purchase Bruner Corporation products directly and that it had to make purchases through Stickler & Associates, the manufacturer's representative for the area. Later that same year, Joseph Prochot, the President and CEO of Bruner Corporation, had a heated conversation with Robert Bruner, Sr., in which Prochot told Bruner explicitly that under no circumstances would the company sell to him directly. After being told twice— by letter and in person by the President of the company—that it had to purchase through Stickler & Associates, R.A. Bruner nevertheless continued to make purchases through John Balogh. Again, a reasonable fact-finder confronted with this evidence could find that R.A. Bruner knew that the goods Balogh was selling were stolen, or at least that it should check with the company to make sure these transactions were legitimate.

This is not to say that Bruner Corporation will necessarily succeed at trial in proving that R.A. Bruner knew that the goods were stolen. There is significant evidence pointing toward the opposite conclusion. Until the current management took over, Bruner Corporation had always allowed R.A. Bruner to purchase through John Balogh, who by all accounts was a veteran and highly respected Corporation employee. Furthermore, Balogh had always given R.A. Bruner a discounted price over the course of their long relationship. When the discount went up 6%, Balogh explained this as a way for R.A. Bruner to remain competitive in the industry. Finally, Bruner Corporation repeatedly reprimanded Balogh for continuing to sell products to dealers who were not official representatives. Its failure to put a stop to these sales could imply that the Corporation tolerated Balogh's maverick behavior to an extent, and could suggest that R.A. Bruner's trust in Balogh may have been well-founded even though it dealt with him outside the normal channels.

Our task, of course, is not to determine which view will ultimately win out on the issue of R.A. Bruner's knowledge. The significant evidence pointing in both directions

is sufficient to render summary judgment inappropriate at this stage of the proceedings. We simply are unable to agree with the district court that, based on the record, no reasonable jury could find that R.A. Bruner had knowledge sufficient to satisfy the *mens rea* requirements of RICO, WOCCA, and Wisconsin's civil conspiracy law. We therefore remand the case to the district court for further proceedings on these claims.

## III. R.A. Bruner's Appeals

R.A. Bruner appeals the district court's denial of its post-judgment motion regarding the Pierringer release and the court's calculation of conversion damages.

### A. *The Pierringer Release*

█ As noted previously, R.A. Bruner filed a postjudgment motion in the district court arguing that the Pierringer release between Bruner Corporation and John Balogh reduces the damages owed by R.A. Bruner to zero. It does not appear that R.A. Bruner raised this argument before the district court during its consideration of the parties' motions for summary judgment. The district court clearly knew of the existence of the Pierringer release during the summary judgment phase, but R.A. Bruner points to nothing to indicate that it raised this legal argument about the effect of the release on the damages that R.A. Bruner must pay. This is unfortunate, for if R.A. Bruner had raised the argument and the district court had found it meritorious, the court would have been spared the task of calculating the damages.

R.A. Bruner argues that discussing the effect of the release was not ripe until after the district court found that R.A. Bruner did not know the goods it purchased from Balogh were stolen, a finding that was not made until the summary judgment motions were decided. Only then was it established that Balogh would be 100% liable to R.A. Bruner in a contribution action.

This argument does not excuse R.A. Bruner's failure to raise this issue before the district court during the summary judgment phase. R.A. Bruner knew that Bruner Corporation had moved for summary judgment on the issue of liability for conversion and the amount of damages; any argument that damages should be mitigated because of the Pierringer release would have been timely at that point. Because the argument was not properly raised before the district court entered judgment, it is waived below and for purposes of appeal. *Anderson v. Flexel, Inc.*, 47 F.3d 243, 247 (7th Cir.1995) ("[P]ost-judgment motions cannot be used to raise arguments or legal theories that could have been and should have been brought before judgment.").

### B. *Calculation of Conversion Damages*

█ After finding R.A. Bruner liable for conversion, the district court turned to the issue of damages. Under Wisconsin law, the plaintiff in a conversion suit may recover the value of the property at the time the conversion took place, plus interest up to the date of trial. *Production Credit Ass'n v. Nowatzski*, 90 Wis.2d 344, 280 N.W.2d 118, 123 (1979).

The district court found that no genuine issue of material fact existed as to the amount of conversion damages, and accordingly it calculated the damages based on the summary judgment record. In determining the award, the district court relied on the affidavit of Marty Ring, the General Accounting Supervisor of Bruner Corporation. The affidavit contains a "summary of documentation of sales of stolen Bruner [Corporation] products to ... R.A. Bruner." It describes 159 transactions in stolen goods between John Balogh and R.A. Bruner beginning on December 13, 1985 and ending on December 31, 1992. According to the list prices set forth in the affidavit, the stolen goods sold during this period were worth $220,498.70, and the district court ordered R.A. Bruner to pay this amount.[6]

---

**6.** The invoices given by Balogh to R.A. Bruner indicate that R.A. Bruner paid $128,431.96 for these goods. R.A. Bruner argues that this payment should be used to offset the conversion damages owed to Bruner Corporation. However, the affidavit states that the payments recorded therein were made to John Balogh, not to Bruner Corporation.

R.A. Bruner argues that the district court made two errors in calculating conversion damages. First, the court should have looked to the discounted prices at which Bruner Corporation sold its goods to retailers, not the higher prices at which these merchants then sold the goods to the public.[7] Second, even if the price offered to the public is the relevant benchmark, there is insufficient evidence to conclude that Bruner Corporation goods actually sold at their list prices. Remand for further proceedings is therefore required, it is argued, to resolve this factual issue.

■ As to the first objection, we agree with the district court that the price that R.A. Bruner charged to consumers is a valid measure of conversion damages under Wisconsin law. *Topzant v. Koshe*, 242 Wis. 585, 9 N.W.2d 136, 138 (1943) ("If it appears that the defendant, in case of ... conversion, has sold the chattels, the plaintiff may, at his election, recover as his damages the amount for which the same were sold, with interest from the time of sale to the day of trial."); *see also Management Computer Serv., Inc. v. Hawkins, Ash, Baptie & Co.*, 196 Wis.2d 578, 539 N.W.2d 111, 121–22 (App.1995) (recognizing this rule but declining to apply it to a claim for unjust enrichment, as opposed to conversion), *rev'd on other grounds*, 206 Wis.2d 157, 557 N.W.2d 67 (1996). The brief submitted by R.A. Bruner's former co-defendants, which R.A. Bruner adopts, admits this and even provides the rationale for this rule: to prevent the tortfeasor from unjustly enriching himself by reselling the converted property above the value set by the rightful owner. *See also Topzant*, 9 N.W.2d at 138 ("These rules will prevent the defendant from making profit out of his wrong."). Although the modern Restatement would apply this rule only when the defendant converter acted with knowledge that its actions were wrongful, RESTATEMENT (SECOND) OF TORTS § 927 cmt. i, illus. 11, there is no indication that Wisconsin has qualified its rule in this way.

■ In response to R.A. Bruner's second objection that consumers did not actually pay list prices, Bruner Corporation points to the affidavit of William Baxter, its Director of Sales and Marketing. The Baxter affidavit states that Bruner Corporation goods sold for the list price "in many cases," but it admits that the Corporation did not control the prices charged to consumers. Instead, retail prices were negotiated between the dealer or manufacturer's representative and the consumer. The affidavit describes the prices (and the compensation for the retailers) as follows:

> With respect to orders for assembled equipment, representatives are entitled to a 10% commission as well as 'overages,' i.e., the difference between the selling price and Bruner's factory discounted price. With respect to orders for parts, however, manufacturers representatives are only entitled to a 10% commission on the sales price and are not entitled to overages.

When Bruner's manufacturers representatives solicit orders for the sale of parts, the sales price is the price negotiated between the representative and the customer, subject to Bruner's approval. It is very unusual for the sales price to reflect the full factory discount available to manufacturers representatives. To the extent a discount is offered, it is typically a lesser discount off list price. In many cases, no discount is offered, and the sales price is Bruner's list price. In any case, Bruner invoices and is paid the negotiated sales price, and the representative who solicited the sale receives a 10% commission on the sales price.

We cannot conclude that this information, which is the only evidence relating to the relevance of list prices, lays to rest all genuine issues of material fact regarding the prices at which R.A. Bruner sold the converted property to consumers. The affidavit describes the considerable discretion afforded retailers in setting their resale prices. This discretion is an important part of the system;

---

7. This argument is made in full in the brief filed by the Lukens defendants, which R.A. Bruner adopts.

savvy retailers are rewarded with higher "overages" and commissions that reflect their ability to negotiate favorable prices with their customers. This evidence simply does not support the inference that R.A. Bruner typically sold Corporation products at their list prices. Thus, because genuine issues of material fact remain as to the actual prices paid by consumers, we remand for further proceedings and recalculation of the conversion damages.

## IV. Conclusion

For the reasons presented above, we vacate the award of $220,498.70 and remand for further proceedings to recalculate Bruner Corporation's conversion damages. In addition, because genuine issues of material fact remain as to R.A. Bruner's knowledge that the goods in question were stolen, we reverse the district court's decision denying relief on the RICO, WOCCA, and civil conspiracy claims, and we remand for further proceedings on these claims.