**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0518n.06
Filed: August 22, 2008

**No. 07-5836**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| G.D. DEAL HOLDINGS, LLC; GIRKIN DEVELOPMENT, LLC; CROWN OIL AND PETROLEUM SUPPLIES, LLC, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | |
| BAKER ENERGY, INC.; RAMESH KAPUR; BHUPINDER SAINI, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Defendants, and | ) ) | |
| SURINDER MULTANI; ROHIT SHARMA, | ) ) ) | |
| Defendants-Appellants. | ) | |

Before: GIBBONS and SUTTON, Circuit Judges; and ACKERMAN, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** This appeal arises from a dispute between

lessors, GD Deal Holdings, LLC, and Girkin Development, LLC. (plaintiffs, collectively) and a

lessee, Baker Energy, Inc. ("Baker"), concerning real property and equipment leases pertaining to

gasoline stations in Kentucky and Tennessee. Defendants Rohit Sharma and Surinder Multani,

Baker's president and director, respectively, guaranteed Baker's obligations under the leases at issue.

Plaintiffs initiated the present action against Baker, Sharma, and Multani to recover damages that

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

it alleges resulted from Baker's breach of these leases. Plaintiff GD Deal filed a motion for summary judgment, which the district court granted.

Sharma and Multani appeal this grant of summary judgment, arguing the district court erred: (1) by concluding that an Agreed Preliminary Injunction did not constitute a novation releasing Sharma and Multani from their obligations to GD Deal; (2) by dismissing Sharma and Multani's counterclaim of overpayment as a matter of law; and (3) because the damages awarded GD Deal constitute a double recovery. For the following reasons, we affirm.

## I.

This case involves a series of leases in which GD Deal or Girkin was the lessor and Clark Retail Enterprises, Inc. ("CRE") was the original lessee. All leases were entered into on April 19, 2001. The leases covered the real property and equipment at 84 gasoline stations and convenience stores. The lessors (and plaintiffs), GD Deal and Girkin, are separate LLCs that share the same Kentucky business address.

First, GD Deal leased the real property at 38 locations ("the GD Deal stores") to CRE pursuant to the GD Deal Master Real Property Lease ("GD Real Property Lease"). Second, GD Deal leased equipment at these 38 GD Deal stores to CRE pursuant to the Master Equipment and Personal Property Lease ("GD Equipment Lease"). Third, Girkin leased the real property connected to 31 stores ("Girkin stores") to CRE pursuant to the Master Lease By and Between [Girkin] and [CRE] ("Girkin Real Property Lease"). Fourth, Girkin assigned CRE its own real property leases for 15 other stores ("the Girkin third party stores"). Finally, Girkin leased CRE the equipment at 46 stores

2

(the Girkin stores and the Girkin third-party stores) pursuant to the Master Equipment and Personal Property Lease ("Girkin Equipment Lease").

Baker eventually assumed CRE's real property and equipment leasehold interests under all of the above leases in 47 of these (84) properties—the 38 GD Deal stores and nine of the Girkin third party stores—during CRE's Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Illinois. With the bankruptcy court's ultimate approval, CRE assigned Baker its leasehold interests (real property and equipment) in all 38 GD Deal stores and nine of the Girkin third-party stores.

Assigning Baker the equipment interest in the nine third-party stores was more challenging. Under the Girkin Equipment Lease, CRE paid Girkin $887,690/year (equating to $73,974.16/month) to rent equipment at 46 stores for the first three years of the lease. But the lease did not allocate this amount among individual stores—some of which used more equipment than others. During its bankruptcy proceedings, CRE sought to reject this lease as to all but the nine stores. Girkin, however, argued the lease was not severable.

Nevertheless, on May 29, 2003, the bankruptcy court issued an order allowing the Girkin Equipment Lease to be severed and concluding that the rent for the equipment at the nine retained Girkin third-party stores could be determined by consensual agreement between Girkin and CRE or by the bankruptcy court itself. In July 2003, when CRE still had not paid any rent for these nine stores, Girkin and GD Deal filed a motion asserting that CRE's unpaid rent for the equipment at these stores for June and July 2003 was $28,964.35 (equating to approximately $14,482.18/month). CRE objected to this motion, asserting that the parties had not determined the amount of rent

3

applicable to the nine stores. Girkin and GD Deal replied, this time attaching an exhibit indicating that CRE owed $28,946 (or $14,473/month) for June and July 2003. The exhibit noted that to reach this figure—constituting of 9/46ths of $73,974.16—for the purposes of the exhibit, the rent was allocated evenly among the 46 Girkin third-party stores.

To resolve the dispute, on August 12, 2003, CRE proposed that it place $241,999.96 in escrow, to account for four months (May, June, July, and August of 2003) of arrearage under the Girkin Equipment Lease, until the exact amount could be negotiated. CRE did not explain how it reached this figure, which equates to roughly $60,500/month.

On August 19, 2003, the bankruptcy court approved CRE's assignment to Baker, including the assignment of the equipment at the nine third-party stores. In so doing, it stated that the specific amounts of any "Cure Payments" for the assumed leases due through the date of the Closing "shall either: (i) be agreed upon by the parties and paid at Closing; or (ii) with regard to any disputed liquidated amounts, such disputed amounts shall be [escrowed at Closing]." GD Deal asserts that at closing, Baker paid Girkin approximately $241,999.96 (equating to roughly $60,500/month) to cure the Girkin Equipment Lease. Baker, Sharma, and Multani neither admit nor dispute this fact.[1]

---

[1] Plaintiffs' complaint asserted that at closing, Baker made a $241,999.96 payment to cure CRE's four month arrearage. Baker's answer provided that it was "without knowledge or information sufficient to form a belief as to the truth of [this allegation]."

GD Deal has incorrectly suggested that the settlement statement "unequivocally" indicates that Baker made this $241,999.96 cure payment to satisfy the Girkin Equipment Lease arrearage. The settlement statement merely provides for the "Landlord Cure payoff for equipment lease" of $245,103.36. This sum refers to the amount to cure the *GD Deal Equipment Lease*—not the Girkin Equipment Lease.

In any event, it is undisputed that Sharma, the president and an equity owner of Baker, and Multani, a director and shareholder of Baker, personally guaranteed Baker's liabilities under all of the leases discussed above.

On September 12, 2003, GD Deal and Girkin notified Baker of its monthly obligations under the GD Real Property Lease, GD Equipment Lease, and portions of the Girkin Equipment Lease. This letter provided that Baker was obligated to pay Girkin $60,500/month to lease the equipment at the nine Girkin third-party stores under the terms of the Girkin Equipment Lease and attached an exhibit allocating the $60,500 rent among the nine stores. Baker asserted that after receiving this letter, it inquired of GD Deal as to how the $60,500 figure was calculated and requested a copy of the Girkin Personal Property Lease. Although Baker was soliciting information regarding the *Girkin* Equipment Lease, it appears that GD Deal and Girkin collaborated in collecting rent.

Baker further asserts that it did not obtain a copy of the Girkin Equipment Lease until late November or early December 2004. When Baker reviewed the lease, it discovered that CRE had only paid $887,690/year (equating to $73,974.16/month) for the first three years of the lease to rent equipment *at all 46 stores covered by the original lease.*[2] Because Baker was only renting equipment at nine out of the 46 stores, it determined that it should only have been charged $14,473.21/month (or 9/46ths of $73,974.16) during the first three years of the lease. Baker contends that its realization was bolstered by the pleadings from CRE's bankruptcy proceedings (discussed above), which suggested that CRE owed Girkin $14,473/month for outstanding rent.

At around the same time, Crown Oil and Petroleum, LLC ("Crown Oil") filed a complaint

---

[2] The lease required CRE to pay $772,141/year (equating to $64,345.08/month) for the fourth and fifth year of the lease.

5

in United States District Court for the Western District of Kentucky. Crown Oil asserted that Baker had assigned Crown Oil its leasehold interests under the applicable leases. Therefore, Crown Oil sought to collect rent from various subtenants operating some of the gasoline stations.

On January 4, 2005, plaintiffs filed a complaint in Kentucky state court, seeking declarations as to: (1) whether Baker had been overcharged by Girkin; and (2) whether Baker had assigned its rights under the lease agreements to Crown Oil, which, plaintiffs contended, would constitute an act of default under the lease agreements. Baker removed this case to the United States District Court for the Western District of Kentucky, where it was eventually consolidated with the action initiated by Crown Oil.

After sending Baker a notice of default and notice of termination upon failure to cure default, GD Deal notified Baker that it was terminating the lease. On January 24, 2005, the district court issued an Agreed Preliminary Injunction, which allowed Crown Oil to collect rent from the subtenants of the properties. But in February 2005, both Crown Oil and Baker filed for Chapter 11 bankruptcy. Although both petitions were eventually dismissed, from February 2005 through August 2005, GD Deal was unable to collect rent from the properties due to the bankruptcy proceedings.

In April 2005, GE Capital Franchise Finance Corporation ("GE Capital")—owner of mortgages on GD Deal's real properties and a security interest on the equipment at the properties— accelerated the amount of debt due and initiated foreclosure on the properties. In August 2005, the Bankruptcy Court for the Western District of Tennessee held that Baker had rejected the leases between it and GD Deal. At that point, GD Deal attempted to collect rent from subtenants of Baker who were operating the properties. However, in September 2005, GE Capital demanded that GD Deal cease its collection efforts from the properties.

6

GE Capital eventually initiated foreclosure on these properties in circuit courts throughout Kentucky. The Kentucky courts appointed a receiver which possessed the properties pending their sale and precluded GD Deal from exercising any ownership over the properties. On January 19, 2007, GD Deal filed its motion for summary judgment seeking damages against Baker, Sharma, and Multani arising from Baker's breach of its obligations relating to the 38 GD Deal stores under the GD Real Property Lease and GD Equipment Leases. GD Deal asserted that its damages from these breaches included: (A) $660,433.96 under the GD Real Property Lease for unpaid rent and delinquent fees covering the unpaid rent through August 2005 when the lease was deemed rejected; (B) $7,766,428.97 under the GD Real Property Lease for accelerated damages covering the remainder of the lease; (C) $451,223.70 under the GD Equipment Lease for unpaid rent through the August 2005 rejection; (D) $1,796,981.00 under the GD Equipment Lease for accelerated damages covering the remainder of the lease; (E) $140,296.04 in legal fees; and (F) $84,813.47 in other miscellaneous damages. In total, GD Deal sought $10,900,177.14 in damages.

GD Deal's motion for summary judgment also specifically stated: "The majority of gasoline stations and convenience stores involved in the Kentucky State Court Foreclosure Proceedings have been foreclosed upon and sold. . . . It is anticipated that the remaining properties will be sold in the near future." The damages figure GD Deal proposed, however, did not account for these foreclosure sales in any way.

In their reply, Sharma and Multani argued that (1) the agreed preliminary injunction constituted a novation discharging Sharma and Multani from their obligations on behalf of Baker,

and (2) GD Deal[3] overcharged Baker $752,253.82. Sharma and Multani did not contest GD Deal's measure of damages in any way and offered no alternative measure.

On May 11, 2007, the district court granted the motion for summary judgment and ordered defendants to pay the damages asserted by GD Deal. Sharma and Multani filed a post-judgment motion to vacate/alter/amend this order pursuant to Federal Rule of Civil Procedure 59 and, in the alternative, seeking relief from the order pursuant to Federal Rule of Civil Procedure 60.[4]

The district court denied Sharma and Multani's post-judgment motion. Sharma and Multani appeal the district court's May 11, 2007 order and its denial of Sharma and Multani's post-judgment motion.

## II.

Summary judgment will be affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). But if "a reasonable jury could return a verdict for the non-moving party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In reviewing

---

[3] As discussed *infra*, Sharma and Multani's contention is really that *Girkin* overcharged Baker under the Girkin Equipment Lease.

[4] The apparent Rule 60 basis for this post-judgment motion was that Sharma and Multani had discovered new evidence: that 35 of the 38 GD Deal stores had been sold. As noted above, however, GD Deal had previously acknowledged in its motion for summary judgment that the majority of properties involved in Kentucky state court foreclosure proceedings had been sold—a fact the district court recognized in its May 11, 2007 order—and that the remaining properties would likely be sold in the near future.

the district court's decision, we draw all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The parties agree that Kentucky law governs the substantive law in this diversity case. *See also Breeding v. Mass. Indem. and Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982) (under Kentucky choice of law principles, courts should apply the law of the state with "the most significant relationship to the transaction and the parties" and "the greatest concern with the specific issue raised in the litigation").

## III.

Sharma and Multani first contend that the January 24, 2005 agreed preliminary injunction constituted a novation whereby Crown Oil assumed Baker's obligations to GD Deal under the lease agreements. The Agreed Preliminary Injunction allowed Crown Oil to assume operational responsibility and collect rent from subtenants, which would then be disbursed to satisfy the leases. The district court concluded that Sharma and Multani did not meet their burden of establishing that the injunction was intended to release the defendants from their obligations. We agree.

Under Kentucky law:

> A novation is the substitution of a new obligation for an old one, with intent to extinguish the old one, or the substitution of a new debtor for an old one, with the intent to release the latter, or the substitution of a new creditor, with the intent to transfer the rights of the old one to him.

*M.A. Walker Co. v. PBK Bank,* 95 S.W.3d 70, 76 (Ky. Ct. App. 2002) (quoting *Truscon Steel Co. v. Thirlwell Elec. Co.*, 96 S.W.2d 1023, 1025 (Ky. 1936)). "[I]ntent is the controlling element . . .[;] unless the transaction was intended to extinguish the old obligation by substituting the new one

9

therefor, a novation is not effected." *Clark v. Thompson*, 219 S.W.2d 22, 28 (Ky. 1948) (quotation omitted). The burden of proving novation is on the party asserting it. *Kirby v. Scroggins*, 246 S.W.2d 453, 455 (Ky. 1952).

Sharma and Multani fail to meet their burden. The Agreed Preliminary Injunction states:

IT IS FURTHER ORDERED as agreed that nothing herein shall be construed or interpreted as a release of any claims defenses by any party, or as a release of the obligations of any guarantor. Further, nothing herein shall be construed or interpreted as a consent or acceptance by GD Deal or Girkin Development to the assignment by Baker Energy to Crown, or a waiver of any defaults under the lease agreements, or a release of Baker Energy's liability under the lease agreements except for subsequent lease payments, which come due while this Order is in place.

This passage unequivocally provides that the injunction was not intended to release Baker from any obligations to GD Deal or Girkin—except for lease payments arising during the period of the 60-day injunction.

Sharma and Multani contend that the intention to substitute Crown Oil for Baker "can be gleaned from the fact that [GD Deal] entered into a new written agreement with Crown Oil where Crown Oil—not Baker—was to be solely responsible for the rent payments due [GD Deal]." But that GD Deal agreed to accept rental payments from Crown Oil for 60 days hardly suggests that it sought to release Baker from its obligations.

Because the injunction did not constitute a novation discharging Baker, the injunction did not release Sharma and Multani from guaranteeing Baker's obligations.

**IV.**

Next, Sharma and Multani argue that the district court erred by granting summary judgment to GD Deal on Baker's counterclaim that it was overcharged by GD Deal. In response to GD Deal's

10

motion for summary judgment, Sharma and Multani alleged that GD Deal had overcharged Baker in excess of $752,253.82.

There are several problems with this argument. Only Baker—not Sharma and Multani—asserted a counterclaim against GD Deal. Sharma and Multani point to no authority that permits them as guarantors to pursue a counterclaim they did not plead.

Moreover, the evidence on the motion reflects that Girkin, not GD Deal, is the party to which Baker paid the alleged overcharges. The evidence of payment to Girkin is consistent with Baker's counterclaim: that Girkin breached the Girkin Equipment Lease by charging Baker more to lease equipment at the nine Girkin third-party stores than the parties had agreed Baker would pay.[5] The only evidence of payment to GD Deal is Sharma's conclusory affidavit, which conflicts with all of the documentary evidence. The district court correctly concluded that Sharma and Multani had not created a genuine issue of material fact as to rent charges paid to GD Deal.

## V.

Finally, Sharma and Multani contest the damages awarded by the district court. The district court adopted GD Deal's measure of damages, which included, *inter alia*, accelerated damages consisting of the present value of future payments arising under the GD Real Property and Equipment leases. Sharma and Multani contend that because GD Deal's properties were sold (by

---

[5] In its counterclaim, Baker alleges that it paid $60,500/month for 16 months to rent equipment at nine stores. Under the terms of the Girkin Equipment Lease, CRE was to lease equipment at 46 stores for $887,690/year (or approximately $73,974.16/month) for the first three years of the lease; and $772,141 (or $64,345.08/month) for the fourth and fifth year. Because it only rented nine out of 46 stores, Baker contends that it should have paid only 9/46ths of these amounts. Thus, it contends that it should have been charged $14,473.21/month (9/46ths of $73,974.16) for the period covered by the first three years of the Girkin Equipment Lease (approximately seven and one-half months) and $12,589.26 (9/46ths of $64,345.08) for the remaining eight and one-half months.

11

GE Capital through foreclosure), the damages awarded should have been offset to account for this mitigation.

Because Sharma and Multani made no effort to contest damages at the summary judgment stage, we decline to entertain their mitigation argument on appeal. *See*, *e.g.*, *Bruner Corp. v. R.A. Bruner Co.,* 133 F.3d 491, 497 (7th Cir. 1998) (argument not raised before the district court during summary judgment phase that damages should have been mitigated was deemed waived). This argument, first advanced in Sharma and Mutani's post-judgment motion, was clearly available to Sharma and Multani at the summary judgment stage. After all, GD Deal's motion for summary judgment had noted that the majority of stores involved in Kentucky foreclosure proceedings had already been sold and that the remaining properties would be sold in the near future. Yet Sharma and Multani did not assert a mitigation argument or any argument related to damages in their reply to GD Deal's motion for summary judgment. Although they raised the issue in their post-judgment motion, this did not preserve the argument. *See generally Morgan v. Fed. Bureau of Alcohol, Tobacco & Firearms*, 509 F.3d 273, 277 (6th Cir. 2007) (issue raised for the first time in motion for reconsideration deemed waived); *Thurman v. Yellow Freight Sys.*, *Inc.*, 97 F.3d 833, 835 (6th Cir. 1996) (issue raised for the first time in motion to amend or alter deemed waived).

Still, we recognize that the waiver rule is prudential, and "[d]eviations are permitted in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice." *St. Mary's Foundry, Inc. v. Employers. Ins. of Wausau*, 332 F.3d 989, 996 (6th Cir. 2003) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)). Whether this standard is met is "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

This court has looked to a number of factors in deciding whether to exercise discretionary review, including: (1) whether an appellee might be "surprised on appeal," *see Nicely v. McBrayer, McGinnis, Leslie & Kirkland*, 163 F.3d 376, 381 (6th Cir. 1998) (quoting *Hormel*, 312 U.S. at 556); (2) whether pure questions of law are at issue, *see Dorris v. Absher*, 179 F.3d 420, 426 (6th Cir. 1999); (3) whether "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of this already protracted litigation[,]" *see Pinney Dock & Transp. Co. v. Penn Cent. Corp*, 838 F.2d 1445,1461 (6th Cir. 1988); and (4) whether "the proper resolution is beyond any doubt[,]" *see Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 261 (6th Cir. 1996).

Application of these factors counsels against our consideration of the damages issue. In their post-judgment motion and their brief on appeal, Sharma and Multani make a very general, incomplete argument. Essentially, they say that the recovery of accelerated damages has permitted double recovery, given the fact that GE Capital foreclosed on the leased properties and sold them. They provide no specific argument or analysis relating to the district court's detailed reasoning considering the proper measure of damages in its May 11 order. Nor do they refer to the district court's reasoned explanation in its order on the post-judgment motion that any recovery from the sale of the properties compensates for a loss different from the loss of rents resulting from Baker's breach and that GD Deal thus has not received a double recovery. The argument invites us to make assumptions about the application of the proceeds of the foreclosures—a task for which we are ill-equipped given the silence of the record on this point. The issues are not purely legal ones but involve facts not developed in the record. Finally, there is little precise guidance from precedent on

13

the question, and the correct result is not entirely clear.  For all these reasons, we choose the better course of declining to review this issue.

## VI.

For the foregoing reasons, we affirm.