James NICELY; Sharon Nicely,
Plaintiffs–Appellants,

v.

McBRAYER, McGINNIS, LESLIE &
KIRKLAND; Phillip Bruce Leslie, Luke
Bentley, III, and Phillip Faye, attorneys
with McBrayer, McGinnis, Leslie &
Kirkland; and John Doe, Nos. 1 through
30, Defendants–Appellees.

No. 97–5675.

United States Court of Appeals,
Sixth Circuit.

Argued April 23, 1998.

Decided Dec. 17, 1998.

Otto D. Wolff (argued and briefed), McMurtry & Wolff, Covington, Kentucky, for Plaintiffs–Appellants.

Richard W. Martin (argued and briefed), Martin, Picklesimer, Justice & Vincent, Ashland, Kentucky, for Defendants–Appellees.

Before: BATCHELDER and COLE, Circuit Judges; McCALLA, District Judge.*

## OPINION

BATCHELDER, Circuit Judge.

Plaintiffs/Appellants James Nicely and his wife, Sharon, appeal the district court's award of summary judgment in favor of Defendants–Appellees McBrayer, McGinnis, Leslie & Kirkland, et al. The Appellants claimed, *inter alia,* that the Appellees committed legal malpractice by incorrectly advising them concerning a potential medical malpractice claim, by failing to correct Mr. Nicely's average weekly wage figure in the workers' compensation action for which the Appellees did represent him, and by failing to pursue a safety violation claim against his employer which, if successful, would have penalized the employer by increasing Nicely's workers' compensation award by fifteen percent, KY.REV.STAT. ANN. § 342.165 (Banks–Baldwin 1997). The Appellants also sought punitive damages against the Appellees concerning a $3,000 fee allegedly taken improperly by the Appellees.

The district court granted the Appellees summary judgment on the issue of the Appellants' medical malpractice cause of action, finding that the Appellants' claim against the Appellees was time-barred. The court also stated that even if the claim were not time-

---

* The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennes- see, sitting by designation.

barred, no attorney-client relationship concerning the medical malpractice claim had ever formed upon which a legal malpractice action could be based. The district court also granted the Appellees summary judgment on the average weekly wage and fifteen percent penalty issues, finding that an increase in Nicely's workers' compensation by either method would have resulted in a corresponding decrease in his social security disability benefits; therefore, Appellants suffered no cognizable damages even assuming Appellees had been negligent. Finally, the district court, *sua sponte*, granted the Appellees summary judgment on the Appellants' punitive damages claim, finding that while the Appellees had improperly taken the $3,000 fee, the Appellants had produced no evidence that the Appellees' acted with an intentional effort to deceive the Appellants in order to harm them, as required by KY.REV. STAT. ANN. § 411.184 (Banks–Baldwin 1997).

For the reasons stated below, we AFFIRM the district court's grant of summary judgment to Appellees regarding the Appellees' alleged negligence concerning the Appellants' medical malpractice action; REVERSE the grant of summary judgment premised upon the Appellants' inability to show damages resulting from the Appellees' alleged negligence concerning James Nicely's average weekly wage figure and the safety violation claim against his employer; and VACATE the grant of summary judgment on the issue of punitive damages.

## I. BACKGROUND

On February 15, 1990, James Nicely was injured at work when the side-door of the front-end loader he was using to pick up steel from a scrap metal pile suddenly opened and a piece of the metal shot into the cab where he was seated, striking him in the side of the face and head, causing massive damage to his sinuses and eyes, and bruising his brain. He was taken to the emergency room at King's Daughters Hospital in Ashland, Kentucky, where an ophthalmologist and oral surgeon operated on his injuries. The oral surgeon performed this surgery in spite of the fact that he had only dental-related hospital surgical privileges. Nicely went home a week later and followed up with his personal physician. Shortly thereafter, his head swelled with infection and the pain from his injuries became unbearable. Nicely eventually consulted another surgeon in Louisville who informed Nicely that he would die without corrective surgery. He further advised Nicely and his fiancee (now wife) to get an attorney because the Ashland doctors had "botched things up." The Louisville surgeon performed the corrective surgery in September 1990. Despite this surgery, Nicely has lost the sight in his right eye, has blurred vision in his left eye, has lost his senses of smell and taste, and has chronic allergies and sinus infections. He also suffers from memory loss, altered personality, depression, and severe headaches.

On October 30, 1990, Nicely met with attorneys from a Louisville law firm to discuss pursuit of a medical malpractice claim against the Ashland hospital and doctors. When the firm learned that the accident might be attributable to safety violations on the part of Nicely's employer, Armco Steel ("Armco"), it declined to take the medical malpractice case because of a potential conflict-of-interest. The firm did, however, discuss with Nicely the statute of limitations period for his medical malpractice claim, including the ramifications of the "discovery" rule, *see infra* note 4, and referred him to another attorney. This second attorney also declined to accept Nicely's medical malpractice case, but suggested, and was retained to file, a workers' compensation claim against Armco. He filed the claim on January 8, 1991.

On January 25, 1991, Nicely met with Bruce Leslie, an attorney with McBrayer, McGinnis, Leslie & Kirkland, seeking representation on his medical malpractice claim. He met with Leslie and explained why he believed he had a legitimate medical malpractice claim against the Ashland doctors. The evidence viewed in the light most favorable to the Appellants indicates that Leslie said he would "look into" the medical malpractice action, but that he would have to get back with Nicely because he had concerns about the statute of limitations. Nicely and Leslie met again on April 2, 1991. At this

meeting Nicely formally hired McBrayer, McGinnis, Leslie & Kirkland to take over the workers' compensation claim, as Nicely was dissatisfied with the counsel he had retained to pursue that claim. Leslie formally declined to represent Nicely on his medical malpractice claim, however, allegedly telling Nicely he did so because the claim had expired on February 15, 1991, one year after the alleged medical malpractice occurred, and was barred by the statute of limitations. Nicely did not pursue any medical malpractice claim afterward because, Nicely alleges, he believed, after talking with Leslie, that it would be time-barred.

McBrayer, McGinnis, Leslie & Kirkland attorney Phil Fay assumed responsibility for Nicely's workers' compensation claim shortly after Nicely hired the firm to pursue it. Fay handled the case until he left the firm in 1993. In April 1992, during Fay's tenure as counsel, Armco forwarded to the firm a check in the amount of $16,783.20 for "reimbursement of medical expenses," apparently intending to compensate Nicely's then-fiancee Sharon for home nursing care she had been providing to Nicely. The law firm took a $3000 fee from the proceeds without first obtaining the approval of the administrative law judge presiding over the workers' compensation claim. Although James and Sharon protested, the firm told them it was entitled to the fee and refused to endorse the check, made out to both James Nicely and the firm, unless Sharon agreed to it. The Nicelys claim that they were in such financial straits that they had no choice but to capitulate to the firm's demands.

Also during Fay's tenure as primary counsel, Nicely asked Fay to pursue a safety violation claim against Armco pursuant to KY.REV.STAT. ANN. § 342.165 (Banks–Baldwin 1997), which, if successful, would have penalized Armco by adding fifteen percent to Nicely's workers' compensation award. Fay responded to Nicely's request by letter, stating,

> If we are unable to settle for a lump-sum then we would file an amended pleading alleging safety violation [sic]. As I mentioned to you, to win on this issue we have to show not only a failure, but an intention-

al failure on behalf of Armco. As I mentioned to you, I would suggest we use this as a bargaining tool in getting a lump sum settlement.

Fay, and later Luke Bentley (who took over Nicely's case when Fay left the firm in 1993), never amended the workers' compensation claim to allege a safety violation.

Finally, during Fay's tenure Nicely also brought to Fay's attention his belief that Armco was underpaying Nicely on his weekly workers' compensation temporary total disability ("TTD") benefit by about $50. However, Fay made no effort to discern Nicely's actual weekly wage upon which the TTD was calculated or otherwise investigate the matter, nor did Bentley when he took over Nicely's case. At a pre-hearing conference before the administrative law judge in 1994 Bentley stipulated, without objection from Nicely, that the average weekly wage currently used to calculate Nicely's TTD benefits was accurate, despite the fact that he had not investigated this issue and apparently was aware that Nicely felt otherwise.

The ALJ issued its decision on October 5, 1994, and Nicely received a copy of it on October 12, 1994. The opinion granted Nicely $306.67 per week for as long as he is disabled, along with twelve percent interest on unpaid installments; all expenses for "the cure and relief from the effects of the injury"; and $40 per day for the home medical care Sharon Nicely was providing and would need to continue to provide to her husband. The Nicelys met with Leslie on November 4, 1994, to discuss their remaining options and those benefits which the Nicelys felt were missing from the ALJ's award. The meeting, however, erupted into a fee argument. Leslie claims that he advised the Nicelys of their remaining options but was instructed to do nothing further.

On November 19, 1994, the parties met again to discuss their options and also for the Nicelys to pick up a back paycheck of James's sent to the firm from Armco. A few days later Nicely sought the assistance of another attorney, but apparently did not officially discharge the Appellees. On November 28, the Appellees sent a letter on Nicely's behalf to Armco asking it to pay one of

James's hospital bills. No motion was ever filed with the ALJ on Nicely's behalf requesting a reconsideration of the award decision; however, Armco did file such a motion, and the Defendants filed a response to Armco's motion on Nicely's behalf. Nicely officially discharged the Defendants shortly thereafter. The ALJ denied Armco's motion for reconsideration on January 5, 1995.

On November 17, 1995, the Nicelys filed this diversity action against the Appellees pursuant to 28 U.S.C. § 1332 alleging legal malpractice. On May 19, 1997, the district court, *inter alia*, awarded summary judgment in favor of the Appellees on the issues discussed above except for the $3,000 fee, which the court ordered the Appellees to return to the Appellants with interest. The Nicelys filed a timely notice of appeal.

## II. DISCUSSION

▆ This Court reviews a district court's grant of summary judgment *de novo*, utilizing the same test used by the district court to determine the appropriateness of the summary judgment award. *Barrett v. Harrington*, 130 F.3d 246, 251 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). In 1986 the Supreme Court handed down three cases, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which, "taken in the aggregate, lowered the movant's burden on a summary judgment mo-

tion." *Barrett,* 130 F.3d at 251. According to *Celotex,*

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, "[i]n order to make a showing sufficient to resist summary judgment, the non-movant must counter with more than a mere scintilla of evidence, such that [a] reasonable jury could find for that party." *Barrett,* 130 F.3d at 252 (citing *Bailey v. Floyd County Bd. of Ed.,* 106 F.3d 135, 140 (6th Cir.1997); *Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994)).

### A. Malpractice Claims Arising from Appellees' Handling of Nicely's Workers' Compensation Claim

*1. Damages Resulting from Failure to Modify Average Weekly Wage.* Appellants allege that the district court erred in determining that, even if the Appellees were negligent in not seeking an increased adjustment in the average weekly wage figure used to calculate Nicely's workers' compensation award, Nicely suffered no cognizable damages because the increase would have resulted in a dollar-for-dollar reduction in his social security disability benefits, leaving unchanged the total amount of disability-related compensation he would receive for his injuries. Appellants concede that Nicely's *current* social security disability benefits would be setoff by any increase in his standard workers' compensation disability award, *see* 42 U.S.C. § 424a; 20 C.F.R. § 404.408, but contend that at age sixty-two, Nicely's disability benefits would be converted into retirement benefits not subject to setoff for receipt of workers' compensation benefits.[1]

---

1. As support for their contention Appellants cite a letter sent to Jim Nicely from the Social Security Administration informing him of his entitlement to social security disability benefits. The letter, which was presented to the district court as an exhibit in the Defendants' motion for summary judgment, contains the following statement:

> Your Social Security disability benefits can be withheld or reduced until you are age 65 because you are receiving workers' compensation and/or another payment because of disability. However, you may be eligible for retirement benefits as early as age 62. Contact any Social Security office to apply for these benefits no

Therefore, Appellants argue, the Appellees' failure to secure the maximum amount of workers' compensation benefits to which Nicely was entitled caused them damages which they will realize when Nicely reaches age sixty-five, and possibly as early as age sixty-two.

 Appellees do not dispute the correctness of the Appellants' legal assertion. Rather, they counter by arguing that Appellants' argument was not raised below and is thus not available on appeal. The rule to which Appellees refer generally states that appellate courts will not consider *issues* which were not properly raised before the district court. *See, e.g., In re White Motor Corp.,* 731 F.2d 372, 375 (6th Cir.1984); *Lyle v. Koehler,* 720 F.2d 426, 428–29 (6th Cir. 1983); *Bannert v. American Can Co.,* 525 F.2d 104, 111 (6th Cir.1975), *cert. denied,* 426 U.S. 942, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Appellate courts ordinarily adhere to this rule because

> our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

*Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). While this Court has applied this rule to *arguments* that were not made before the trial court, even though the general issue had been raised, *see, e.g., Sigmon Fuel Co. v. Tennessee Valley Auth.,* 754 F.2d 162, 164 (6th Cir.1985); *Jewell v. Ohio State Univ.,* 941 F.2d 1209, 1991 WL 158755 (6th Cir. Aug. 14, 1991) (unpublished per curiam), we do not believe it would be appropriate to do so in this instance. The statute which articulates the

very setoff provision at issue clearly states in its opening sentence that it applies only to disability benefits received before the claimant reaches age sixty-five. *See* 42 U.S.C. § 424a ("If for any month prior to the month in which an individual attains the age of 65...."). Also, the letter received by Nicely from the Social Security Administration, which the Appellees attached as an exhibit to their motion for summary judgment, clearly iterates that the setoff provision applies only to disability benefits received before the age of sixty-five, and also indicates that Nicely may even be eligible for retirement, as opposed to disability, benefits (which would not be subject to 42 U.S.C. § 424a's setoff) as early as age sixty-two. *See supra* note 1.

Because this information was clearly before the district court, the court should not have needed specific presentation of the argument in order to be aware that Nicely's benefits would no longer be subject to setoff when he reaches sixty-five, and possibly sixty-two, and to consider that fact when deciding whether Nicely had suffered an injury due to the Appellees' alleged negligence. While trial attorneys should generally bear the burden of bringing the trial court's attention to the facts and law which they believe relevant to their positions, they should not be found to have waived an argument on appeal when it is premised upon the obvious implications that derive from the very opening words of the statute the court is called upon to apply. In the same way the Appellees cannot legitimately claim to have been "surprised on appeal," *Hormel,* 312 U.S. at 556, 61 S.Ct. 719, by the Appellants' claim, as their own Exhibit 3 to their Motion for Summary Judgment indicated that the social security benefits received by Nicely would no longer be subject to the setoff when Nicely reaches age sixty-five, and possibly even age sixty-two.

Accordingly, we reverse the judgment on Appellants' claim that Appellees were negligent in failing to pursue an increase in Nicely's average weekly wage calculation. On

---

earlier than 3 months before the month you want to receive retirement benefits. J.A. at 109 (Def's Motion for Summ. J. Ex. 3); *see also* J.A. at 110 (Def's Motion for Summ. J. Ex. 3) ("When a worker under age 65 is entitled to both

workers' compensation and/or another payment because of disability and Social Security disability benefits, the amount of the Social Security payment may have to be reduced.").

remand, the trial court is instructed to consider the merits of that claim, and should it determine that the Appellees were in fact negligent in that regard, a determination upon which we make no comment or suggestion, the court can apply the life expectancy tables deemed appropriate under Kentucky law to calculate the present value of the damages deemed to accrue from the Appellees' negligence. *See* KY.REV.STAT. ANN. § 342.260(2) (Banks–Baldwin 1997); *Palmore v. E & R. Chumley Trucking Co., Inc.*, 761 S.W.2d 181 (Ky.Ct.App.1988) (using life expectancy tables to compute workers' compensation award); *Morris v. Morris*, 293 S.W.2d 243 (Ky.1956) (using life expectancy tables to discern present value of dower right).

*2. Damages Resulting from Appellees' Failure to Allege Employer Safety Violation.* KY.REV.STAT. ANN. § 342.165(1) (Banks–Baldwin 1997), provides:

> If an accident is caused in any degree by the intentional failure of the employer to comply with any specific statute or lawful administrative regulation made thereunder, communicated to the employer and relative to installation or maintenance of safety appliances or methods, the compensation for which the employer would otherwise have been liable under this chapter shall be increased fifteen percent (15%) in the amount of each payment. If an accident is caused in any degree by the intentional failure of the employee to use any safety appliance furnished by the employer or to obey any lawful and reasonable order or administrative regulation of the commissioner or the employer for the safety of employees or the public, the compensation for which the employer would otherwise have been liable under this chapter, shall be decreased fifteen percent (15%) in the amount of each payment.

Without determining whether a material question of fact existed as to whether Nicely's accident arose out of Armco's intentional failure to comply with a specific statute or regulation, the district court held that even if Nicely had a valid claim under § 342.165, his social security disability benefits would have been setoff by the fifteen percent increase in the award, and therefore, he suffered no cognizable damages from the Appellees' alleged negligence.

■ Appellants argue that Nicely's social security disability benefits would not be offset by an unsafe workplace penalty award because the latter is not a "workers' compensation benefit" (*i.e.*, an award to compensate the worker for a work-related injury), but is rather a penalty assessed against the employer as a sort of punitive damage. In support the Appellants cite Kentucky precedent which characterizes the fifteen percent increase in a worker's compensation award as a penalty, "[t]he purpose of [which] is not to compensate workers or their families but to penalize those employers who intentionally fail to comply with safety regulations." *Ernest Simpson Constr. Co. v. Conn*, 625 S.W.2d 850, 851 (Ky.1981). For example, in *Apex Mining v. Blankenship*, 918 S.W.2d 225 (Ky.1996), the Kentucky Supreme Court held that KY.REV.STAT. ANN. § 342.730(1)(a), which limits "income benefits" received under the workers' compensation laws to one hundred percent of the state's average weekly wage, does not apply to the fifteen percent penalty award under § 342.165 because the latter is not an "income benefit," but is rather a monetary "penalty" for certain safety violations.

20 C.F.R. § 404.408 requires reduction of social security disability benefits to which an individual is entitled if the individual is also "entitled to a periodic benefit (including workers' compensation or any other payments based on a work relationship) on account of a total or partial disability" under a federal or state law. 20 C.F.R. § 404.408(a)(2)(i) (1997); *see also* 42 U.S.C. § 424a. The district court reasoned that the fifteen percent penalty, since it would merely increase Nicely's disability award, is a "periodic benefit ... based on the work relationship" and stemming from "total or partial disability," and thus subject to the setoff. The district court supported this determination by referencing subsection (d) of § 404.408, which lists "items not counted for reduction," none of which concern "penalties." § 404.408(d).

While the district court's reasoning is understandable, it does not comport with the

purposes behind § 404.408's setoff provision. In *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), the Court wrote:

> In response to renewed criticism of the overlap between the workmen's compensation and the social security disability insurance programs, Congress reexamined the problem in 1965. Data submitted to the legislative committees showed that in 35 of the 50 States, a typical worker injured in the course of his employment and eligible for both state and federal benefits received compensation for his disability in excess of his take-home pay prior to the disability.... It was strongly urged that this situation reduced the incentive of the worker to return to the job, and impeded the rehabilitative efforts of the state programs. Furthermore, it was anticipated that a perpetuation of the duplication in benefits might lead to the erosion of the workmen's compensation programs. The legislative response was § 224, which, by limiting total state and federal benefits to 80% of the employee's average earnings prior to the disability, reduced the duplication inherent in the programs and at.the same time allowed a supplement to workmen's compensation where the state payments were inadequate.

*Id.* at 82–83, 92 S.Ct. 254 (citation and footnote omitted); *see also Davidson v. Sullivan*, 942 F.2d 90, 92 (1st Cir.1991) (reproducing a portion of this quote from *Richardson* to demonstrate the purpose behind the setoff provision).

It is clear from *Richardson* that the purpose of the setoff is to reduce federal and state overlap of disability benefits. Kentucky's penalization of employers whose safety violations lead to injury, even though in the form of a fifteen percent increase in the workers' compensation award arising from such injury, does not overlap with any corresponding federal social security disability compensation provision. Failure to apply the setoff to a penalty award under § 342.165 will not "reduce[ ] the incentive of the worker to return to the job [or] ... impede[ ] the rehabilitative efforts of the state program[ ]," *Richardson*, 404 U.S. at 83, 92 S.Ct. 254, because the worker's social security disability benefits will still be substantially diminished by the worker's base workers' compensation award.

42 U.S.C. § 424a provides that an individual's social security disability benefits are subject to setoff if he also receives "periodic benefits *on account of his or her total or partial disability* ... under a workmen's compensation law or plan of the United States or State, or ... under any other law or plan" of the United States or a State. 42 U.S.C. § 424a(a) (emphasis added). Nicely's *initial* workers' compensation award falls under this definition, but the fifteen percent added penalty under KY.REV.STAT. ANN. § 342.165, while *related to* his disabling injury, is not "*on account of*" his injury; rather it is "on account of" *the employer's safety violation.* The concept would be no different if, rather than being figured as a percentage of the workers' compensation awarded, the penalty was instead calculated as a percentage of the company's net income for the previous year. The fact that the Kentucky legislature chose to peg the penalty to the compensation award should not affect the analysis—the compensation figure is used only as a means of fixing the penalty award, much like a cap in a punitive damages statute. Thus, it should not matter to what figure the penalty award is pegged, so long as it is truly a "penalty" and not "compensation." *Cf. Apex Mining*, 918 S.W.2d at 229 ("Regardless of whether the penalty is computed as a function of an income benefit or other compensation, the penalty clearly is not an income benefit and presents no conflict with the limitation on income benefits which is contained in KRS 342.730(1)(a).")[2]

**2.** To the extent that *Bookheimer v. Sec. of Health & Human Servs.*, No. 88–1938, slip op. (W.D.Penn. May 31, 1991) (unpublished), is not in accordance with our opinion, we expressly disagree with it, although we find that, for the most part, it is fairly distinguishable. *Bookheimer* addressed a "violation of a specific safety requirement" award ("VSSR") given to an injured Ohio worker who argued that because his VSSR was based on his employer's fault, rather than on his own need for injury compensation, it should not be included when figuring the amount of setoff under 42 U.S.C. § 424a. Because Ohio case law clearly considered VSSR's "workers'

Social Security Rulings tangentially support our position, also. For example, S.S.R. 82–5, 1982 SSR LEXIS 41 (1982), addressed a New Jersey statute which stated that a lump sum settlement arising from a claim of compensation following an employee's accident was to be considered a workers' compensation benefit *only* for purposes of computing insurance ratings. The claimant argued that the limitation in the New Jersey statute prevented the Social Security Administration from considering his lump sum settlement as workers' compensation for the setoff dictated by § 424a. The Administration held that a particular state's law specifically exempting a certain payment from being considered a "workers' compensation benefit" is not binding upon the Social Security Administration's determination of the applicability of the § 424a setoff. In doing so, however, it stated that state law *is* important for assessing the "nature and purpose" of the benefit payment at issue, which are "ultimately controlling." *Id.* at *5. The SSR states,

> Although ... the New Jersey statute is not binding [on the Social Security Administration] for purposes of section 224 of the Act, this does not mean that the State law is of no importance. It is the actual "nature and purposes" of the payment rather than the words used to describe it which are ultimately controlling (see Larson, The Law of Workmen's Compensation, III, § 97.34 (1973 ed)). State law is of great importance in determining the "nature and

purposes" of the particular payment at issue.

*Id.*

Similarly, SSR 81–33, 1981 SSR LEXIS 15 (1981), addressed an Iowa statute that in certain specified situations, allowed disputed workers' compensation claims to be settled by payment of a lump sum amount, which, when approved by the workers' compensation commission, would be binding on the parties. The statute specifically stated that "such payment shall not be construed as the payment of weekly compensation." *Id.* at *2. The Administration stated that it was the "'real nature and purpose of the payment rather than the words used to describe it that ultimately controls.'" *Id.* at *3 (quoting ARTHUR LARSON, 3 THE LAW OF WORKMEN'S COMPENSATION § 97.34 (1973)). Finding that the payment was in effect a substitution for workers' compensation benefits, regardless of what the statute said about its not being considered "weekly compensation," the Administration found the setoff provisions to apply. If the setoff provision were found not to apply, it reasoned,

> only those Iowa employees who received a lump-sum payment as a result of a settlement agreement would receive both a full WC benefit and a full disability benefit under [42 U.S.C. § 423]. Such a situation would certainly impede the rehabilitative efforts of the Iowa WC program and result in the erosion of the program by encourag-

---

compensation," the administrative law judge and the Social Security Appeals Council found the VSSR subject to setoff. The district court affirmed, stating:

> The fact that the payments may have a dual purpose does not defeat the fact that they are compensation to the employee. Plaintiff would have the court reject the dual nature of the payments, and instead focus merely upon their punitive nature against the employer. The Ohio Supreme Court has specifically rejected that approach, and upheld the notion that payment to a worker for injuries sustained in the course of his employment may have more than one purpose. As a result, the findings of the Appeals Council of the Social Security Administration will be affirmed.

*Id.* at 3.

Because *Bookheimer*'s holding rested heavily upon how VSSR's were characterized under Ohio law, the case before us is distinguishable.

Unlike Ohio, Kentucky precedent expressly states that the fifteen percent safety violation penalty's purpose "is not to compensate workers or their families but to penalize those employers who intentionally fail to comply with safety regulations." *Ernest Simpson Constr. Co.*, 625 S.W.2d at 851. Its goal "is to promote workplace safety by encouraging workers and employers to follow safety rules and regulations," *Apex Mining*, 918 S.W.2d at 228, rather than to compensate workers for their injuries. To the extent that the *Bookheimer* reasoning could apply to the case *sub judice*, however, we find that, besides being of little precedential value (as it is not only an unpublished district court opinion from another circuit but is also unavailable even on the electronic services) it fails to appreciate the underlying purpose of the setoff provision, which is to prevent overlap between federal and state disability benefit awards, *see Richardson*, 404 U.S. at 83, 92 S.Ct. 254.

ing employees to seek settlements rather than pursue their claims to the full extent provided by Iowa law.

*Id.* at *7.

While social security "[r]ulings do not have the force and effect of the law or regulations" and "are [not] to be relied upon as precedents in determining other cases [except] where the facts are basically the same," Preface, S.S.R. iii (Cum. Ed.1982), they do indicate what the Administration considers when making its determination. The SSRs discussed above indicate that the Administration is concerned with the policies underlying the purposes of the setoff provision and the "nature and purpose" of the state monetary award at issue. Because the "nature and purpose" of the fifteen percent penalty award is penalization, rather than compensation, and because it does not create an overlap between federal and state awards that would impede the incentive to return to work, we believe that the Administration would not find Kentucky's fifteen percent penalty award subject to § 424a's setoff.

Accordingly, we reverse the grant of summary judgment on this claim. The district court on remand is instructed to consider the merits of the Appellants' argument concerning whether the Appellees were negligent in failing to pursue a claim for Nicely under KY.REV.STAT. ANN. § 342.165, another determination upon which we make no comment or suggestion.

## B. Malpractice Claim Arising from Appellee Leslie's Statement Concerning Appellants' Medical Malpractice Claim

When viewed in the light most favorable to the Appellants, the evidence indicates that Appellee Leslie incorrectly advised the Appellants that the statute of limitation had run on their medical malpractice claim. The district court found that, even if the Appellees could be liable for malpractice based upon this alleged statement, the Appellants' legal malpractice claim premised upon it would itself be barred by Kentucky's statute of limitations. In the alternative, the district court determined that, even if Appellee Leslie had so advised the Appellants, no contrac-

tual attorney/client relationship was ever established as to the medical malpractice claim from which a legal malpractice claim could arise. Because we agree with the district court that a legal malpractice claim premised upon Leslie's statement would be time-barred, we specifically decline to consider whether reliance on an attorney's allegedly erroneous statement about the viability of one's cause of action, made in the process of declining representation in the matter, can support a legal malpractice claim against the attorney under Kentucky law.

The alleged medical malpractice occurred on February 15, 1990, and a week later Nicely went home from the hospital. Sometime later he experienced severe pain and, upon consulting a different surgeon, learned that the pain was the result of an infection caused, in the surgeon's opinion, by the Ashland doctors' "botch[ing] things up." This surgeon performed corrective surgery in September 1990.

In Kentucky, medical malpractice actions must be commenced within one year after the cause of action "accrues," which means when the injury is first discovered or when it reasonably should have been discovered, so long as discovery occurs within five years of the occurrence of the alleged malpractice. KY.REV.STAT. ANN. § 413.140(1)(e), (2) (Banks–Baldwin 1997). Therefore, Nicely's medical malpractice claim expired sometime between February and September 1991, depending upon when the one-year anniversary of his "discovery" of the Ashland doctors' alleged negligence occurred.

Kentucky's statute of limitations for legal malpractice states in relevant part,

[A] civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

KY.REV.STAT. ANN. § 413.245 (Banks–Baldwin 1997). The Kentucky Supreme Court has found two separate statutes of limitation contained in § 413.245. The first limits the

commencement of the cause of action to within one year from the date of the "occurrence," and the second limits the commencement of the cause of action to within one year from the date on which the plaintiff was or reasonably should have been aware of his cause of action. *Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky.1994). The second, or "discovery" rule, is the only one germane to the Appellants' case.[3]

■ The district court noted that the Appellants did not allege a proposed date on which they "discovered" their cause of action against the Appellees. Under Kentucky law,

> [a] party is responsible to know the date on which a cause of action is or reasonably should have been discovered. It is that knowledge, whether actual or imputed, that triggers the start of any applicable statute of limitations.... Knowledge that one has been wronged starts the running of the statute of limitations.

*Affholder, Inc. v. Preston Carroll Co., Inc.*, 27 F.3d 232, 235 (6th Cir.1994) (citing *Gill v. Warren*, 751 S.W.2d 33 (Ky.Ct.App.1988), and *Conway v. Huff*, 644 S.W.2d 333 (Ky. 1982)). It is the responsibility of the Plaintiff to anticipate the statute of limitations defense and provide sufficient facts to overcome it. *See Lunsford v. Elfers*, 756 S.W.2d 146, 147 (Ky.Ct.App.1988).

The record shows that Nicely learned about the statute of limitations and the discovery rule from discussions with the first law firm he contacted, which refused to take on his medical malpractice case for conflict-of-interest reasons. In fact, Nicely testified that when Leslie allegedly told him that Kentucky courts usually considered the statutory time period to begin on the date on which the medical malpractice actually occurred, it was Nicely who stated that he thought the discovery rule would extend the deadline to the one year anniversary of his corrective surgery.[4] Accordingly, the district court found that Nicely knew or should have known he was given erroneous advice when, in April 1991, the Appellees allegedly told him that the statute had already run. Thus, the "discovery" and "occurrence" one-year periods were coterminous and the malpractice action, filed outside of the statutory period, is time-barred.

■ The Appellants, however, claim that the "continuous representation" rule tolled the statute of limitations until the Appellees concluded their representation of Nicely in his workers' compensation action, which concluded sometime on or after November 28, 1994, thereby making their November 17, 1995, filing within the one year limitation period. The "continuous representation rule" is a "branch of the discovery rule," *Alagia, Day, Trautwein & Smith v. Broad-*

3. The alleged legal malpractice "occurred" when Leslie allegedly misinformed Appellants on April 2, 1991, that their medical malpractice claim had expired. The one year statute of limitations on the legal malpractice claim, however, did not begin to run until the medical malpractice claim had actually expired, *see Michels*, 869 S.W.2d at 730–31. The medical malpractice claim expired one year after the Appellants learned that the Ashland doctors had allegedly "botched things up," making September 1991 (one year after the corrective surgery) the latest possible expiration date. Therefore, the Appellants' legal malpractice claim, under the "occurrence" rule, expired at the very latest in September 1992, well before they filed their claim against the Appellees on November 17, 1995. Accordingly, the viability of the Appellants' legal malpractice claim rises or falls upon the "discovery" rule.

4. Nicely's deposition testimony is as follows:
Q.... Do you remember any discussion of Mr. Leslie regarding the malpractice case, other than I think you said he would look into it?

. . . .
A. The thing that Bruce was talking about, he said usually they just went by, you know, the statute of limitations of one year. And then at that time, I told him, I said there was a discovery period, too, September, when I had the surgery. And he said that the courts usually didn't go by the discovery date and this and that, you know. And that's about all I remember, you know.
Q. When you raised an issue with him on the discovery date, obviously you had talked to the law firm in Louisville about it prior to talking to Mr. Leslie. Was it there that they mentioned that the statute of limitations might be affected by the date of discovery verses the date of the actual malpractice?
A. Yeah. I talked to them about that, and they said if I could find another attorney, you know, but the discovery date probably—
Q. Could be September, you say?
A. Right.
J.A. at 154–55 (Jim Nicely Dep.).

*bent,* 882 S.W.2d 121, 125 (Ky.1994), "which tolls the legal negligence statute of limitations so long as the attorney continues to represent the client in the matter." *Id.* at 122. It is justified on the premise "that by virtue of the attorney-client relationship, there can be no effective discovery of the negligence so long as the relationship prevails," *id.* at 125.

The district court found that the continuous representation rule did not apply because the "continued" representation between Appellees and Appellants concerned a cause of action unrelated to that as to which the alleged malpractice took place. Appellants argue that the representation need not be for the same or a related matter for the rule to apply, and in the alternative, that Appellees' workers' compensation representation was sufficiently related to the medical malpractice claim so as to fit within the "same or similar matter" requirement.

■ As for the Appellants' contention that the representation need not be for the same or a related matter, they are mistaken. Kentucky has never directly addressed the issue, and the few cases discussing the continuous representation rule all have dealt with malpractice which arose from the same representation which was continued. *See, e.g., Broadbent,* 882 S.W.2d 121; *Michels,* 869 S.W.2d 728; *Hibbard v. Taylor,* 837 S.W.2d 500 (Ky.1992); *Gill,* 751 S.W.2d 33. In *Broadbent,* however, the Kentucky Supreme Court defined the rule as "a doctrine of law which tolls the legal negligence statute of limitations so long as the attorney continues to represent the client *in the matter.*" 882 S.W.2d at 122 (emphasis added). Also, the first Kentucky case to discuss the rule, *Gill v. Warren,* quoted the rule as follows: " 'As applied in legal malpractice action, [sic] the rule tolls the statute of limitations or defers accrual of the cause of action while the attorney continues to represent the client *and the representation relates to the same transac-*

*tion or subject matter as the allegedly negligent acts.*'" 751 S.W.2d at 36 (quoting *Wall v. Lewis,* 393 N.W.2d 758, 762 (N.D.1986) (emphasis added)).[5]

A case handed down recently by the Supreme Court of South Dakota is directly on point. In *Greene v. Morgan, Theeler, Cogley & Petersen,* 575 N.W.2d 457 (S.D.1998), attorney Theeler had drawn up an antenuptial agreement for Greene in 1988. Following the marriage, Theeler continued to represent Greene by providing estate planning and asset protection advice. When Greene divorced in 1993 he learned that the antenuptial agreement was void as against public policy pursuant to a case which had been around in South Dakota since 1978, and of which Theeler stated he was aware. The state supreme court held the malpractice claim was time-barred and found that "Greene and Theeler had an ongoing, continuous relationship; however, this relationship was not related to the alleged negligent act involving the antenuptial agreement." *Id.* at 460. Given the language in the Kentucky precedent addressing this issue, and its previous reference to foreign precedent for interpretation of the "continuous representation rule," we have no reason to expect that Kentucky would hold any differently if squarely presented with the question.

■ The Appellants are also mistaken that the Appellees' representation of Nicely in his workers' compensation matter satisfies the "same or related matter" requirement. Appellants' brief states:

The only service Jim [Nicely] sought and ever sought from Defendants was redress for his personal injuries sustained on February 15, 1990. He initially sought to pursue a medical malpractice action for his injuries, but, after erroneously being told that the time had passed, he did pursue with the law firm his personal injuries via the workers' compensation laws. Jim

---

5. Moreover, cases discussing the rule in other jurisdictions uniformly mention that "the attorney's 'involvement after the alleged malpractice [must be] for the performance of the same or related services and not merely continuity of a general professional relationship.'" *Smith v. Stacy,* 198 W.Va. 498, 482 S.E.2d 115, 124 (W.Va.1996) (quoting *Muller v. Sturman,* 79 A.D.2d 482, 437 N.Y.S.2d 205, 207 (N.Y.App.Div. 1981)); *see also Greene v. Morgan, Theeler, Cogley & Petersen,* 575 N.W.2d 457 (S.D.1998); *Stevens v. Lake,* 615 So.2d 1177 (Miss.1993); *Lima v. Schmidt,* 595 So.2d 624 (La.1992); *Schoenrock v. Tappe,* 419 N.W.2d 197 (S.D.1988).

sought two possible redresses for his injuries, injuries which arose from the same facts and events. A civil, medical malpractice case would require much of the same proof, witnesses, parties, testimony and medical evidence as did the workers' compensation claim.

Unfortunately for Appellants, a similar attempt at "widening the scope" was rejected in *Greene*. The court noted, "Greene has made broad statements that the [antenuptial] agreement was a part of his larger asset protection plans. While this may be true, to apply the continuous representation doctrine in such an attenuated fashion would be improper." *Id.* " '[T]he inquiry is not whether an attorney-client relationship still exists on any matter or even generally, but when the representation of the specific matter concluded.' " *Smith v. Stacy*, 198 W.Va. 498, 482 S.E.2d 115, 121 (W.Va.1996) (quoting RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 21.12, at 822 (4th ed.1996)); *see also Stevens v. Lake*, 615 So.2d 1177, 1182 (Miss.1993).

Because the representation for which the Appellants retained the Appellees was not related to Appellants' medical malpractice cause of action, the "continuous representation rule" would not apply and the Appellants' cause of action against the Appellees, insofar as it is related to the statements allegedly made by Leslie regarding their medical malpractice claim, is time-barred. We therefore affirm the judgment of the district court as to that issue.

### C. Punitive Damages

The Appellants alleged that the Appellees had improperly taken a $3000 fee from a medical benefits reimbursement check sent to the firm by Armco and made out to both Jim Nicely and the law firm. The district court determined that the Appellees had in fact been negligent in taking the fee, finding that Kentucky's workers' compensation laws required the Appellees to seek the approval of attorneys fees from the administrative law judge presiding over the claim before such fees can be taken, *see* KY.REV.STAT. ANN.

§ 342.320 (Banks–Baldwin 1997). However, the court determined that the Appellants had produced no evidence that the Appellees had acted with "an intentional effort to deceive the Plaintiffs in order to harm them" as required by Kentucky's statute addressing punitive damages, KY.REV.STAT. ANN. § 411.184 (Banks–Baldwin 1997), and thus granted the Appellees summary judgment, *sua sponte*, on Appellants' punitive damages claim.

Seven days before the oral argument in this case, the Kentucky Supreme Court issued *Williams v. Wilson*, 972 S.W.2d 260 (Ky.1998), which found KY.REV.STAT. ANN. § 411.184(1) unconstitutional insofar as it requires a plaintiff to show more than "gross negligence" on the part of the defendant before the plaintiff can secure punitive damages.[6] Because we are remanding this case for resolution of other issues, we will vacate the district court's award of summary judgment on the Appellants' claim for punitive damages and instruct the district court to determine if and to what extent *Williams* affects the disposition of Appellants' request for punitive damages in the case *sub judice*.

### III. CONCLUSION

For the reasons stated above we AFFIRM district court's award of summary judgment to Appellees on the Appellants' legal malpractice claim premised upon the alleged advice given them concerning their medical malpractice cause of action; we REVERSE the district court's award of summary judgment with respect to the Appellants' claims regarding the average weekly wage figure and the fifteen percent safety violation penalty and REMAND those issues for further proceedings consistent with this opinion. Finally, we VACATE the district court's grant of summary judgment regarding Appellants' punitive damages claim for the reasons and with the instructions previously mentioned.

---

**6.** On August 27, 1998, the Kentucky Supreme Court denied rehearing, thereby finalizing

*Williams.* KY REV.STAT. ANN. § 76.30(b) (Banks–Baldwin 1997).