**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0868n.06
Filed: November 29, 2006

**No. 06-5063**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re: Regal Cinemas, Inc., | ) | |
| | ) | |
| Debtor, | ) | |
| | ) | |
| Queensgate Associates, LLC, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Appellant, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| v. | ) | |
| | ) | |
| Regal Cinemas, Inc., | ) | |
| | ) | |
| Appellee. | ) | |

Before: MOORE, ROGERS, GIBSON,[*] Circuit Judges.

ROGERS, Circuit Judge. Queensgate appeals the judgment of the district court affirming the bankruptcy court's decision that Queensgate was not entitled to its damage claim in Regal Cinemas' bankruptcy. Queensgate and Regal were parties to a lease that included a provision requiring Regal to restore the floors to a level condition upon notice by Queensgate. Queensgate was to provide the notice within six months of termination or expiration of the Lease. The bankruptcy court ruled that Queensgate failed to provide notice as required under the Lease and the district court

---

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

upheld that decision. Queensgate now appeals the judgment of the district court, arguing that Queensgate provided the notice required under the Lease or, alternatively, that Queensgate was excused or prevented from providing more detailed notice. Queensgate also challenges the decision of the bankruptcy court that its claim for damages is capped by § 502(b)(6) of the Bankruptcy Code, an issue the district court did not reach. Because Queensgate did not provide the notice required under the Lease, we affirm without reaching the question of whether Queensgate's damages are capped by § 502(b)(6).

## I. Facts and Procedural History

### A. Initial proceedings in the bankruptcy court

The dispute between Queensgate as lessor and Regal as a tenant arose when Regal filed for bankruptcy under Chapter 11. Regal filed a motion to reject the Lease in the Queensgate Shopping Center, and the bankruptcy court entered an order authorizing the rejection of the Lease as of November 30, 2001. On November 21, 2001, Queensgate filed a claim against Regal in the amount of $1,811,811.42. The amount of the claim included 15% of the rent reserved under the Lease ($587,236.80), pre-petition common-area-maintenance charges and taxes ($34,644.62), and damages to the premises ($1,190,000.00). Regal objected to the claim on February 26, 2002, on the ground that Queensgate's claim exceeded the damage cap provided by 11 U.S.C. § 502(b)(6), which operates to cap a lessor's damages resulting from a rejection of an unexpired lease in bankruptcy. Queensgate responded to Regal's objection on April 3, 2002, stating that the § 502(b)(6) cap did not

apply to its claim because the claim was for actual physical damages to the premises. Specifically, Queensgate claimed that Regal "damaged and destroyed the built in theatre seats, the built in projector equipment, walls, other property permanently affixed to the Leasehold Premises, and otherwise caused considerable damage to the Leasehold Premises." Queensgate claimed that these actions were in direct violation of § 13 of the Lease, which provided that Regal was to "maintain the Leased Premises in the same good and orderly condition in which it was delivered," and that § 502(b)(6) did not limit the amount of the claim since it was for physical damages. Regal and Queensgate filed cross motions for summary judgment. The bankruptcy court held that § 502(b)(6) applied to, and thus capped, all of Queensgate's claims. Queensgate appealed ("First Appeal") and the district court reversed the decision of the bankruptcy court, holding that the § 502(b)(6) cap did not apply to Queensgate's claim for damages to the premises unrelated to the Lease termination.

**B. Trial in the bankruptcy court**

Following the district court's remand, the bankruptcy court conducted a trial on the issue of damages. In the Joint Pretrial Statement filed with the bankruptcy court, Queensgate claimed that the general provisions of the Lease supported its claim. Specifically, Queensgate referred to § 13(a) of the Lease, which provided that Regal must "maintain the Leasehold Premises in the same good and orderly condition in which it was delivered" and return it to Queensgate in the same condition, excepting ordinary wear and tear; § 14(a) of the Lease, which required Regal to remove "all alterations and improvements made during the Lease Term"; and § 17(a) of the Lease, which required Regal to return the premises to Queensgate "in as good order and condition as when

received, ordinary wear and tear excepted." The breach of these Lease provisions, according to Queensgate, resulted in damages of almost $1.2 million. Finally, Queensgate referred to ¶ 3(G) of the Addendum to the Lease ("Addendum"), which provides that

> [u]pon the expiration of the Lease Term or the Renewal Terms (or upon any earlier termination of the Lease), the Tenant shall, at the option of the Landlord, restore the floor of the Leased Premises to the condition of same as of the date of the Lease, including, but not limited to, removal of all theater seats, and removal of any elevated or graduated flooring . . . . Landlord shall give Tenant written notice if Landlord desires Tenant to restore the floor of the Leased Premises . . . within six (6) months after any termination of the Lease.

Queensgate stated that the breach of this provision of the Lease caused it damages of "at least $739,298.00."

The hearing in the bankruptcy court included testimony from Michael Arkin, principal of Queensgate Associates; Jeffrey Packard, a construction estimator; and Matthew Laughlin, an employee of Regal who was the general manager of the theater located in the Queensgate Shopping Center.

Michael Arkin testified that the condition of the premises following Regal's departure was one of "intended destruction," that the seats were removed, wires were pulled out from the wall, and trash strewn about. He testified regarding his desire to return the premises to a "vanilla box" condition suitable for general retail use and stated that he requested an estimate from Packard regarding the costs associated with converting the premises to vanilla box condition. Arkin also testified that the floors were never leveled because Queensgate was waiting for Regal to pay

Queensgate's claims, but also that another theater was currently operating on the premises. On cross-examination, Arkin stated that there were no receipts for any alleged damages to the premises because the space was leased to the new tenant in an as-is condition and that the new tenant made any necessary repairs. Regarding the repair estimate attached to Queensgate's response to Regal's objection filed with the bankruptcy court, Arkin acknowledged that there was nothing in the estimate to indicate that the cost of leveling the floors was a significant portion of the costs. When asked whether written notice was provided to Regal regarding the floors, Arkin testified that he did not send any notice, but that he asked his attorneys to do what was necessary in the bankruptcy case. When counsel for Regal asked Arkin whether Arkin offered to purchase the theater equipment from Regal, Arkin answered in the affirmative.

Packard testified regarding the costs of restoring the leased premises to vanilla box condition. He detailed the necessary steps in restoring the floors to level condition and the steps taken in formulating an estimate. When asked about the related costs of restoring the floors, Packard went into detail about the process, specifically that once the floor elevation is changed, one must also deal with related repairs, to the walls, for example. On cross-examination by Regal's attorney, Packard stated that he was not asked to submit an estimate regarding costs to repair damage or vandalism to the premises.

Laughlin testified for Regal regarding Regal's vacating of the leased premises. He testified that Regal removed and discarded the seats and the screens and removed the projection equipment. Laughlin said that wiring was capped-off with wire nuts when the poster cases were removed, and

that there were holes in the walls where the screws holding up the poster cases had been removed. He stated that Regal left the premises in a clean condition.

During closing arguments, counsel for Queensgate focused on Regal's obligation to level the floors under ¶ 3(G) of the Addendum. He maintained that, because this was a Chapter 11 case, all Queensgate could do was reduce its claim to money damages, which it did. Counsel argued that Queensgate provided notice with the estimate attached to Queensgate's response to Regal's objection. Additionally, counsel for Queensgate argued that Regal failed to raise the issue of notice under ¶ 3(G) of the Addendum and that Regal could not at trial rely on such a defense. Finally, Queensgate pointed to Regal's duties under § 14 of the Lease, which required Regal to remove alterations and improvements made during the Lease term, and Queensgate maintained that its claim was not capped by § 502(b)(6).

Regal maintained in its closing argument that the issue of any duty to level the floors was not brought up until after the district court's remand and that, in any event, § 502(b)(6) capped Queensgate's claim.

The bankruptcy court again denied Queensgate's claim. In its memorandum opinion, the court rejected Queensgate's argument that the general provisions of the Lease required Regal to restore the floors to a level condition. The bankruptcy court noted that the general provisions did not mention leveling the floors. Because ¶ 3(G) of the Addendum dealt specifically with the condition of the floors, the court reasoned, the general rule of construction that specific provisions

control general provisions applied. The court stated that it was "undisputed that Queensgate gave no formal notice of its desire to have the floors leveled," and rejected Queensgate's argument that the proof of claim and response to Regal's objection provided the required notice. The court pointed out that Queensgate consistently argued until trial that Queensgate offered to purchase Regal's equipment so that Queensgate could continue to operate the premises as a theater and that neither Regal nor the court was on notice of Queensgate's claim regarding the floors. Finally, the bankruptcy court held that Queensgate's claim regarding the floors was subject to the cap in § 502(b)(6).

### C. The second appeal

Queensgate again appealed to the district court. Queensgate argued that (1) its proof of claim and response to Regal's objection were sufficient to provide Regal with the notice required by ¶ 3(G) of the Addendum; (2) the automatic stay precluded Queensgate from providing any notice beyond its proof of claim and response to Regal's objection; (3) Regal's rejection of the Lease excused Queensgate from its obligation to provide notice; (4) Regal waived any objection to the claim based on the notice provisions of the Lease because Regal relied only on § 502(b)(6) in objecting to Queensgate's claim; and (5) the claim was not capped by § 502(b)(6). The district court affirmed the decision of the bankruptcy court.

First, the district court held that the bankruptcy court did not err in its determination that Queensgate failed to give Regal proper notice of its restoration claim as required by ¶ 3(G) of the

Addendum. The district court found that nothing in Queensgate's claim was sufficient to put Regal on notice that Queensgate's claim had anything to do with the leveling of the floors. The district court also rejected Queensgate's argument that the automatic stay prevented it from giving Regal notice as required by ¶ 3(G) of the Addendum, referring to a number of cases holding that the automatic stay did not prevent a creditor from giving required notice to a debtor. The court further held that Queensgate did not present sufficient authority to support its argument that Regal's rejection of the Lease excused Queensgate's failure to give the notice required by ¶ 3(G). Finally, the court found that Regal did not waive its right to assert lack of notice as a defense to Queensgate's claim because Queensgate itself had failed to put Regal on notice of the basis for its claim. The district court did not reach the question of whether Queensgate's claim was limited by § 502(b)(6).

Queensgate now appeals.

## II. Analysis

### A. Standard of review

In reviewing bankruptcy decisions from a district court, the "standard of review is slightly different from our normal standard of review because district courts are not the triers of fact of bankruptcy cases." *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir. 1993). Because the bankruptcy court makes the initial findings of fact, this court is bound by those findings of fact unless they are clearly erroneous. *Id.* Conclusions of law are reviewed de novo. *Id.* When a question in the bankruptcy context involves a mixed question of law and fact, the court "must

break it down into its constituent parts and apply the appropriate standard of review for each part."

*Id.*

The parties dispute whether the holding that Queensgate did not provide notice to Regal as required under ¶ 3(G) of the Addendum is a finding of fact or conclusion of law. Queensgate maintains that the holding regarding notice is a conclusion of law and subject to de novo review. Regal argues that this holding is a finding of fact and subject to the clearly erroneous standard. To the extent that the question is whether, in light of the undisputed facts, Queensgate provided notice as required under the Lease, the question is a legal one, subject to de novo review. *See Golden v. Kelsey-Hayes Co. (In re Golden)*, 73 F.3d 648, 653 (6th Cir. 1996) ("Questions of contract interpretation are generally considered questions of law subject to *de novo* review.").

**B. Sufficiency of the notice provided by Queensgate**

Queensgate failed to provide sufficient notice to Regal of Queensgate's intent to exercise its rights under ¶ 3(G) of the Addendum because its actions during the relevant time period served only to conceal the nature and source of its claim. First, Queensgate's proof of claim ("POC") was not sufficient to provide notice because it merely included a claim for "Damages to the Premises" and stated that the total cost to "Restore the Premises" was $1,190,000. This was not sufficient notice because it makes no mention of the Lease or the Addendum, and a claim regarding leveling of the floors cannot be gleaned from a claim related to "damages" to the premises. Queensgate maintains that the POC was sufficient because it provided accurate notice of the existence, nature, and amount

of the claim as well as Queensgate's intent to hold the estate liable. However, this merely states the standard for asserting a valid claim. *See In re O'Malley*, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999). Regal does not contest the sufficiency of Queensgate's POC as a claim, but argues that the POC did not suffice as notice under the Lease. Although the notice requirement in ¶ 3(G) of the Lease is not especially detailed and requires only that Queensgate provide written notice, it is apparent that the two lines in the POC asserting a claim for physical damages to the premises were not sufficient to put Regal on notice of Queensgate intent to exercise its rights under ¶ 3(G) of the Addendum and impose an obligation on Regal to level the floors. *See LTV Corp. v. Gulf States Steel, Inc.*, 969 F.2d 1050, 1058 (D.C. Cir. 1992) (holding that Gulf States' proof of claim was not sufficient notice under an indemnity agreement with LTV).

Nor was Queensgate's response to Regal's objection, standing alone, sufficient to provide the required notice. In its response to Regal's objection, Queensgate claimed that Regal "damaged and destroyed the built in theatre seats, the built in projector equipment, walls . . . and otherwise caused considerable damage to the Leasehold Premises," in violation of § 13(a) of the Lease, which required Regal to return the premises to Queensgate in a good and orderly condition. Queensgate also maintained that the estimated cost of repairing the damage allegedly caused by Regal was $1,190,000. Standing alone, this response did nothing to put Regal on notice of Queensgate's intent to invoke its right under ¶ 3(G) of the Addendum because the response invoked an entirely different Lease provision and stated a claim for physical damages to the premises. The response does not come close to indicating that the damages claimed would require a leveling of the floors.

Finally, the cost estimate prepared for Queensgate by Jeffrey Packard did not suffice as notice under the Addendum. The repair estimate was for costs associated with restoring the premises to a "vanilla box" condition suitable for general retail tenants. The estimate included a description of work regarding the floors. In particular, it specified removal of concrete slabs and steps to accommodate re-establishment of a four-inch concrete slab at the original floor elevation. Queensgate maintains that this cost estimate was sufficient notice under the Lease and that Regal was thus obligated to restore the floors to a level condition or pay for the costs of doing so. Queensgate's argument that the cost estimate constituted sufficient argument fails, however, in light of the surrounding circumstances. Prior to trial in the bankruptcy court, it appears that Queensgate was attempting to characterize its claimed remedy as one arising from intentional conduct, presumably because such a theory would prevent the application of the cap of § 502(b)(6). It was not until trial in the bankruptcy court following the First Appeal that Queensgate asserted that its claim actually arose under ¶ 3(G) of the Addendum. Although Queensgate is correct that the Addendum does not require a specific form of notice or that the notice assert that Queensgate is seeking its remedy pursuant to the Addendum, it would stretch the bounds of reasonableness to conclude that Queensgate's actions prior to trial in the bankruptcy court put Regal on notice of its intent to exercise its rights under ¶ 3(G).

The notice provision is presumably in the Addendum so that the parties can be certain of their obligations within the specified time frame following expiration or termination of the Lease. Such certainty is not possible where the party required to give notice effectively buries that notice. An

implied obligation on the part of Queensgate was to give notice that would reasonably inform Regal of its duties. *Cf. Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679 (Pa. Super. Ct. 1988) ("[W]here it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it."). The "notice" Queensgate provided was buried in a cost estimate attached to a pleading asserting that the estimate was for costs to repair intentional damages to the premises. The cost estimate was for nearly double what Queensgate claims is the cost to restore the floors, included no breakdown of costs for individual repairs, and the reference to the floors consists of a few lines. Furthermore, Queensgate complained early in the proceedings that it attempted to purchase the theater equipment from Regal in order to continue operating the premises as a theater, but that Regal refused. Such a position is arguably inconsistent with the notion that Queensgate was really seeking to have Regal level the floors so that the premises would be unfit for use as a theater. Queensgate cannot obfuscate the source of the remedy and the remedy itself in an attempt to achieve a desirable result in the bankruptcy court and then rely on the same conduct to show that its was propounding a different theory all along.

### C. The automatic stay

The automatic stay did not prevent Queensgate from giving sufficient notice because Queensgate could have provided adequate notice in the bankruptcy proceedings by including in its POC or in its response to Regal's objection a reference to the Lease or a clear indication of its intent

to invoke ¶ 3(G).[1]  Just as the automatic stay did not prevent Queensgate from asserting in its POC and in its response to Regal's objection that the claim was based on intentional damages to the premises, it did not prevent Queensgate from asserting that its claim was based on the terms of the Lease.

**D. Waiver**

Because Regal was not put on notice that Queensgate's claim was premised on ¶ 3(G) of the Addendum until trial in the bankruptcy court, Regal did not waive its objection based on Queensgate's failure to give notice.  Queensgate argues that Regal waived any objection to Queensgate's claim other than the objection based on § 502(b)(6).  As stated by the district court, this argument is circular and without merit.  Queensgate maintained until trial in the bankruptcy court that its claim was based on alleged damages to the premises caused by Regal.  It is hard to argue that Regal was under an obligation to assert an objection to a claim when Regal was unaware of the basis for the claim until 2005.  *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006) ("Waiver is the intentional relinquishment or abandonment of a known right." (quoting *United States v. Osborne*, 402 F.3d 626, 630 (6th Cir. 2005))).  Queensgate refers the court to *In re Snelson*, 305 B.R. 255 (Bankr. N.D. Tex. 2003), for the proposition that an affirmative defense not pleaded is waived.  However, in *Snelson*, the bankruptcy court found that the debtor was on notice of the nondebtor's claim based on a liquidated damages provision of the parties' lease.  305 B.R. at

---

[1]Queensgate argues that a demand to Regal to restore the floors would have violated the automatic stay.  However, the Addendum does not require a demand, but merely written notice.

261-62. Unlike the lessor in *Snelson*, Queensgate did not put Regal on notice of its claim under ¶ 3(G) of the Addendum, so Regal was not in position to waive a defense to such a claim. *In re Enjet, Inc.*, 220 B.R. 312 (E.D. La. 1998), is also inapposite. In *Enjet*, the district court reversed the bankruptcy court's decision allowing the debtor to amend its objection to a claim after the deadline for asserting objections had passed. The district court held that the amendment did not relate back because the debtor's later objection (challenging the validity of the claim) was inconsistent with its earlier, timely objection (objecting to a claimed set-off). 220 B.R. at 315. In *Enjet*, the debtor was clearly on notice of the source of the creditor's claim and merely waited too long to assert its rights, resulting in waiver. Because Regal was not put on notice of Queensgate's claim under ¶ 3(G) of the Addendum, it cannot be said that Regal knowingly waived its right to rely on the notice provision of ¶ 3(G).

### E. Excuse of Queensgate's obligation to provide notice

We do not decide whether Queensgate was excused from giving notice because of Regal's breach of the Lease. Queensgate did not raise this argument in the bankruptcy court and "[t]his court has repeatedly held that it will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice." *United States v. Ninety-Three Firearms*, 330 F.3d 414, 424 (6th Cir. 2003) (internal quotation marks omitted).

To avoid a finding that this argument was waived, Queensgate argues that the argument was presented to the bankruptcy court. Queensgate asserts that because it has consistently maintained

that whatever notice it provided was sufficient in light of Regal's rejection of the Lease, "[i]t necessarily follows . . . that any further performance by Queensgate is excused," and that this argument was thus before the bankruptcy court. Queensgate bases its argument on this court's decision in *Nicely v. McBrayer, McGinnis, Leslie & Kirkland*, 163 F.3d 376 (6th Cir. 1998). In *Nicely*, this court held that specific presentation in the district court of an argument related to damages in a malpractice case was unnecessary where the relevant statute and other evidence made the lower court aware of a basis for a claim of injury resulting from the malpractice. 163 F.3d at 381. Based on *Nicely*, Queensgate argues that the obvious implications of Regal's rejection of the Lease was that Queensgate's obligation to provide notice was excused and that, as in *Nicely*, the issue was clearly before the bankruptcy court. Queensgate refers to its Memorandum of Law Regarding Notice Requirements Under the Addendum to Lease (Memorandum of Law), filed with the bankruptcy court, in arguing that the issue was squarely before the bankruptcy court. However, the Memorandum of Law does not present any argument from which Queensgate's new argument—that it was entirely relieved of providing notice—can be discerned. In fact, in the Memorandum of Law, Queensgate effectively conceded that it was required to provide notice when it stated that "[t]he only prerequisite that the contract imposes on Queensgate's rights under this provision is that it provide the Tenant with a written notice of its 'restoration' obligation." Queensgate also argued in the Memorandum of Law that it fully complied with the orders of the bankruptcy court and that this satisfied the notice requirement *under the Lease*. It is difficult, if not impossible, to conclude that the argument that Regal's rejection of the Lease excused Queensgate's duty to provide notice "necessarily follows" from Queensgate's Memorandum of Law, in which Queensgate conceded that

notice was required and argued that notice was provided.  Thus, this case is unlike *Nicely* and this

court will not consider the argument for the first time on appeal.

### III. Conclusion

Because we conclude that Queensgate did not provide notice to Regal as required by the

Lease, we do not reach the issue of whether Queensgate's claim is capped by § 502(b)(6).  The

judgment of the district court is affirmed.